1999-NMCA-107

987 P.2d 409

**STATE of New Mexico, Plaintiff–Appellant,**

v.

**Robert Alan STEINZIG, Defendant–Appellee.**

**No. 19,210.**

Court of Appeals of New Mexico.

June 4, 1999.

Certiorari Denied, No. 25,817, July 28, 1999.

754

Patricia A. Madrid, Attorney General, M. Victoria Wilson, Ass't Attorney General, Santa Fe, for Appellant.

Phyllis H. Subin, Chief Public Defender, Christopher Bulman, Appellate Defender, Santa Fe, for Appellee.

## OPINION

DONNELLY, Judge.

{1} The State appeals from an order suppressing evidence seized by law enforcement officers pursuant to a search warrant issued by a district court judge. Two issues are raised on appeal: (1) whether the affidavit for search warrant provided sufficient information for the issuing judge to satisfy the veracity requirement of the informants named in the affidavit; and (2) whether the trial court erred in ruling that the drugs and drug paraphernalia seized during the search of Defendant's residence were not subject to the plain view exception. Reversed and remanded.

*FACTS*

{2} Shortly before 8:00 a.m. on the morning of April 3, 1997, Officer Tony Baca, an Albuquerque police officer, observed two individuals, later identified as Jennifer Turner and Albert Eugene Hudgins, engaged in what appeared to be a drug transaction with a third unidentified individual. Officer Baca stopped Turner and Hudgins' vehicle, approached the driver, and upon looking into the vehicle observed a $100 bill in Hudgins' lap. Officer Baca removed the bill and noted that it appeared to be counterfeit. Another police officer arrived at the scene and observed a crack pipe and two counterfeit $10 bills in the vehicle next to Turner's seat. Officer Baca then contacted the United States Secret Service to report that the two individuals arrested were in possession of counterfeit currency.

{3} Hudgins and Turner were transported to the Albuquerque Secret Service Office where they were advised of their rights and separately interviewed. Based on information concerning Defendant's alleged involvement in counterfeiting activities, Special Agent James Downey prepared an affidavit for a search warrant to search Defendant's apartment in northeast Albuquerque, New Mexico. The affidavit recited in part:

Hudgins was at the residence of his friend, James Hancock who lives with a roommate named "Bob." According to Hudgins, Hancock is very knowledgeable about computers and was showing him how he could make fake identification. Hancock also showed Hudgins how he could make counterfeit money by placing a bill on a scanner and then altering the bills and eventually printing the counterfeit bills. On one occasion, Hancock printed out two $10 bills and on another occasion a $100 and gave it to Hudgins. Hudgins stated that he has seen Hancock scanning personal checks into the computer and he knows that he's making counterfeit New Mexico drivers licenses, passports and selling drugs. Hudgins was then transported by [Special Agents] Harris and Downey after he agreed to show us where Bob and James Hancock were residing. He indicated that they lived in a large two story duplex on Lowell Street. Hudgins indicated that the computer room is located at the top of the flight of stairs and then to the left. Hudgins also advised [Special Agents] Harris and Downey that there is a Mossberg 12 gauge shotgun inside the front door and that "Bob" carriers a "hammerless" .45 caliber handgun. According to Hudgin [sic], "Bob" carries the handgun whenever he leaves the apartment, but he does not know where he keeps the gun while inside the apartment

. . . .

. . . . Turner stated that she too was at the residence of "Bob" and James Hancock with her boyfriend, Lyle Redbird, earlier this same date. Turner stated that she observed Bob hand Hudgins several counterfeit bills. Turner stated that she was in the computer room and saw that there were three copiers, a computer, printer and scanner that James was using in the last 24 hours. She indicated that Hancock was the computer nerd and that Bob was selling drugs.

Turner advised [Special Agent] Downey and [Special Agent] Ferrell and [Special Agent] Schwalm that she knew that Bob and James had some guns and knives in the house. Turner was shown several photographs of individuals identified by Albuquerque Police Department and U.S. Secret Service as methamphetamine users. These individuals have been subjects of other investigations by the Albuquerque Police Department and the U.S. Secret Service for crimes such as manufacturing

and passing counterfeit bank checks and creating false New Mexico Drivers licenses.

.... All of the individuals were identified by Turner as being at the 5801 Lowell, NE [Albuquerque] address on 4/3/97.

The affidavit recited that the phone number given by the two informants was in fact Defendant's correct phone number. In addition, Hudgins and Turner were both transported, separately, approximately twenty minutes apart to the place they each independently identified as Defendant's residence.

{4} The affidavit also stated that the black Chevy S–10 pickup truck and New Mexico license plate identified by Hudgins and Turner, were registered to Defendant. The affidavit further explained that, "Hudgin [sic] had previously indicated to [Special Agent] Ferrell that [Defendant] used to own a windshield repair business but did not know what James Hancock did for a living other than the criminal activity." Special Agents Harris and Downey, who transported Hudgins to this address, also observed the pickup truck in the condominium complex.

{5} After reading the affidavit, District Judge James F. Blackmer approved the issuance of a search warrant on April 3, 1997, for the search of Defendant's residence for equipment and materials used to produce counterfeit currency, checks, and other legal documents. The Albuquerque police executed the search warrant that same day.

{6} Defendant filed a motion to suppress evidence obtained during the search of his residence, asserting that: (1) the search warrant was overly broad; (2) the evidence seized was not found inadvertently, thus precluding application of the plain view exception; (3) the affidavit in support of the search warrant failed to provide a basis for the reviewing judge to determine the veracity of the informants; (4) the information in the affidavit was stale; (5) the search for counterfeit equipment was a pretext for a search for drugs, and thus, was not conducted in good faith; and (6) the State violated Rule 5–501 NMRA 1997, by failing to provide written recorded statements of the informants taken by police officers on April. 3, 1997.

{7} The State filed a response to Defendant's motion, and Defendant subsequently filed an amendment to the motion to suppress adding that: (1) the police officers failed to knock and announce their presence before using force to enter Defendant's residence; (2) the officers used unreasonable force in handcuffing Defendant during the search; and (3) Special Agent Downey omitted material facts from the affidavit for search warrant.

{8} At the hearing on Defendant's motion, Defendant reasserted each of the claims stated in his original motion and amendment to the motion, except his claim regarding the application of the plain view exception. He acknowledged that inadvertence is no longer a requirement for reliance on the plain view exception.

{9} Defendant testified at the motion to suppress. He testified that he was in his residence preparing to take a shower when he heard a loud noise. He testified that he left the bathroom and entered his bedroom and that when the officers entered the bedroom, he was bumped from behind and he fell onto the closet floor. He also testified that he was handcuffed and then permitted to sit on the bed. Defendant told the officers that he had a shotgun in the bedroom. Defendant testified that he was given his *Miranda* warnings, and he was helped into his trousers and then was taken downstairs where he was directed to sit on a couch with two other individuals who were in the house at the time the officers entered.

{10} The State called three witnesses. Special Agent Downey testified regarding the interrogation of the informants and the information they provided, and two Albuquerque police officers testified concerning their entry into Defendant's residence and execution of the search warrant on April 3, 1997. Officer Steve Rodriquez testified that he had been informed that there was reason to be concerned for officer safety in the execution of the search warrant because information had been received that the occupants had access to weapons, including a shotgun and a hand gun. Rodriquez stated that when he approached the apartment he

saw someone inside the house through a sliding glass door. He knocked on the door and announced that the police were present to execute a search warrant. Rodriquez also testified that when the person inside did not respond, he ordered a forced entry into Defendant's residence to ensure officer safety. Rodriquez further testified that it is standard procedure to handcuff suspects during a search in order to ensure officer safety.

{11} Officer Anthony Maez also testified at the suppression hearing regarding the search of Defendant's residence. Maez stated that pursuant to the search warrant he searched Defendant's residence for large items, such as computers, laminating machines and printers, and for small items, such as computer disks, driver's licenses and birth certificates. While looking for such items in the master bedroom, he testified that he *found crack cocaine in plain view on top of* the dresser and a night stand and that he observed small plastic bags similar to those used for distribution of narcotics. Continuing his search, in the closet he found a small round box, large enough to hold driver's licenses, but which, when opened, he found to what he believed to be cocaine. In addition, he testified that he found mushrooms in a plastic bag in the closet.

{12} At the conclusion of this testimony, the trial court granted the motion to suppress. In explaining its ruling, the trial court specifically addressed three of Defendant's claims. The trial court stated it believed that the evidence should be suppressed because the search warrant did not authorize the officers to search for and seize drugs found in the premises, and that the affidavit failed to set forth specific reasons to verify or believe the information provided by the named informants was credible or sufficiently corroborated. The trial court stated, however, that it disagreed with Defendant's claim that the officers failed to properly knock and announce before forcibly entering Defendant's residence.

## DISCUSSION

### A. Probable Cause

{13} The State argues that the trial court erred in determining that the information contained in the affidavit for the search warrant was insufficient to establish probable cause.

{14} In reviewing the sufficiency of evidence to establish probable cause for the issuance of a search warrant, we examine the record to determine whether the State has made "a showing of the existence of facts which would lead a judge or magistrate, acting in a neutral capacity and as a prudent person, to reasonably believe that evidence relating to the commission of a crime exists on the premises requested to be searched." *State v. Wisdom,* 110 N.M. 772, 774, 800 P.2d 206, 208 (Ct.App.1990), *overruled on other grounds by State v. Barker,* 114 N.M. 589, 594, 844 P.2d 839, 844 (Ct.App.1992). Under the *Aguilar–Spinelli* test adopted by our Supreme Court in *State v. Cordova,* 109 N.M. 211, 213, 784 P.2d 30, 32 (1989), in order to establish the existence of probable cause, the affidavit must contain facts which provide a substantial basis for believing any hearsay statements are credible and for believing that there is a factual basis for the information furnished. *See In re Shon Daniel K.,* 1998–NMCA–069, ¶¶ 9–11, 125 N.M. 219, 959 P.2d 553. In making this determination we consider solely the information within the four corners of the affidavit submitted in support of a search warrant. *See* ¶ 8; *see also Barker,* 114 N.M. at 590, 844 P.2d at 840. A determination by the judge or magistrate who issued the search warrant that probable cause supports the issuance of the warrant, as a general rule, is given deference by a reviewing court. *See Wisdom,* 110 N.M. at 774, 800 P.2d at 208; *see also State v. Bowers,* 87 N.M. 74, 76, 529 P.2d 300, 302 (Ct.App.1974).

{15} On appeal we review the evidence submitted in support of a search warrant in the light most favorable to the factual determination made by the issuing judge or magistrate below, resolve all conflicts in the evidence, and indulge all reasonable inferences in support of that judge. *See Wisdom,* 110 N.M. at 774, 800 P.2d at 208. In performing this function, we are mindful that a reviewing court should apply common sense to the affidavit as opposed to hyper-technical requirements, since most affidavits are pre-

pared by non-lawyers. *See In re Shon Daniel K.*, 1998-NMCA-069, ¶ 8, 125 N.M. 219, 959 P.2d 553. The ultimate decision, however, as to whether the contents of an affidavit are legally sufficient is a question of law which we review de novo. *See Wisdom*, 110 N.M. at 774, 800 P.2d at 208.

{16} In challenging the order of suppression, the State argues, *inter alia*, that the trial court erroneously determined that the affidavit submitted in support of the search warrant lacked sufficient information to support the veracity or credibility of the two named informants. We agree.

{17} An informant's tip can establish probable cause to support the issuance of a search warrant so long as it satisfies the two-pronged *Aguilar–Spinelli* test articulated in *Cordova*, 109 N.M. at 213, 784 P.2d at 32, and Rule 5–211(E) NMRA 1999. The facts contained in the affidavit must set forth sufficient information to permit the issuing judge or magistrate to make an independent determination of probable cause. *See generally* 2 Wayne R. LaFave, *Search and Seizure* § 3.3(a), at 89–90 (3d ed.1996) (noting reliance on conclusory statements made by affiant impermissibly shifts the independence requirement away from the issuing judge or magistrate). To support a finding of probable cause the affidavit must establish (1) the informant's "basis of knowledge," and (2) facts showing the informant's "veracity." *See Cordova*, 109 N.M. at 213, 784 P.2d at 32. At the hearing below, Defendant did not argue that the affidavit failed to satisfy the first prong of *Aguilar–Spinelli* requirements. Thus, our review of the existence of probable cause for the issuance of the search warrant is limited to the question of whether there was a sufficient basis for the issuing judge to determine the veracity of the informants' statements.

{18} Under the veracity prong, the affidavit must set forth sufficient facts for the issuing judge to independently determine either the inherent credibility of the informants or the reliability of their information. *See In re Shon Daniel K.*, 1998–NMCA–069, ¶ 9, 125 N.M. 219, 959 P.2d 553. As this Court recently observed in *In re Shon Daniel K.*, the New Mexico State Constitution accords broader protection against unreasonable searches and seizures than its federal analog. *See id.* ¶ 7. However, this Court stated:

> Reliability of an informant may be established, among other ways, by showing that: (1) the informant has given reliable information to police officers in the past; (2) the informant is a volunteer citizen-informant; (3) the informant has made statements against his or her penal interest; (4) independent investigation by police corroborates informant's reliability or information given; and (5) facts and circumstances disclosed impute reliability.

*Id.* ¶ 12 (citations omitted).

{19} Defendant points out that the informants in this case had not given reliable information to the police in the past nor were they shown to be volunteer citizen-informants. *See id.* ¶¶ 13–16; *State v. Hernandez*, 111 N.M. 226, 228, 804 P.2d 417, 419 (Ct.App.1990). The informants, however, were identified by name. As recognized by the Washington Court of Appeals, this fact can be a significant factor in determining the reliability or veracity of the informants. *See State v. O'Connor*, 39 Wash.App. 113, 692 P.2d 208, 213–14 (1984); *cf. State v. Michael G.*, 106 N.M. 644, 647, 748 P.2d 17, 20 (Ct. App.1987) (noting that use of citizen-informant's name aids in indicia of reliability). The *O'Connor* court also observed that identification of an informant is significant because the *"Aguilar/Spinelli* strictures were aimed primarily at *unnamed* police informers." 692 P.2d at 213. It also stated that a reasonable inference concerning the informant's reliability may be derived from the fact that a named informant has greater incentive to provide truthful information because he or she is subject to unfavorable consequences for providing false or inaccurate information to a greater degree than an unnamed or anonymous individual. *See id.*

{20} In addition, the circumstances surrounding the statements of a named individual can support a conclusion that the informant is credible. As noted by Professor LaFave:

[O]ne who knows the police are already in a position to charge him with a serious crime will not lightly undertake to divert the police down blind alleys. Thus, where the circumstances fairly suggest that the informant "well knew that any discrepancies in his story might go hard with him," that is a reason for finding the information reliable. In such a situation, it is the "clearly apprehended threat of dire police retaliation should he not produce accurately" more so than the admission of criminal conduct which produces the requisite indicia of reliability.

LaFave, *supra,* § 3.3(c), at 129–30 (footnotes omitted).

{21} An additional factor recognized by some courts which may corroborate the credibility of an informant is the fact that certain facts supplied by him or her have been independently corroborated. *See State v. Hasselback,* 55 Or.App. 281, 637 P.2d 1316, 1319 (1981) ("The same information given independently by two sources supplies a basis for believing the information to be true."); *State v. Hall,* 53 Wash.App. 296, 766 P.2d 512, 514–15 (1989) (the informant's veracity supported by fact that information was corroborated during a separate interview with another informant); *cf. State v. Hernandez,* 95 N.M. 125, 126, 619 P.2d 570, 571 (Ct.App. 1980) (holding that one of factors for probable cause to detain and arrest the defendant was brother-in-law's independent corroboration of dispatcher's report).

{22} In this case both informants were arrested as a result of police observation of criminal activity. The informants were arrested and taken to the Secret Service office for questioning, separated immediately, given their *Miranda* warnings, and independently asked about where they received the counterfeit bills. Although separated, Hudgins and Turner gave almost identical information to the Secret Service agents. They both stated that they had been at Defendant's residence, that James Hancock also resided there, that they saw computers and other equipment being used to counterfeit money and other legal documents, that they obtained counterfeit money at Defendant's house, that there were weapons in the house, and that Defendant owned a black Chevy S–10 pickup truck. In addition, each informant separately accompanied the Secret Service agents at different times and correctly pointed out Defendant's residence.

{23} Finally, the affidavit recites that the Secret Service corroborated various aspects of the information given by the informants through police observation and investigation. *See State v. Baca,* 97 N.M. 379, 381, 640 P.2d 485, 487 (1982) (court may rely on fact that information in affidavit is corroborated by police observation or investigation to support the informant's credibility). Specifically, Turner gave the Secret Service agents a telephone number for Defendant's residence that the agents verified through U S West to be Defendant's telephone number. The agents also independently verified through the Motor Vehicle Department and Secret Service records that the address given by the informants as Defendant's residence was correct. Additionally, the agents verified information given by the informants indicating that Defendant owned the black Chevy S–10 pickup and that the vehicle bore the same license plate number as related by the informants. Finally, the Secret Service agents independently verified that Defendant had operated a windshield repair business, as indicated by Hudgins.

{24} In sum, we conclude that the affidavit submitted in support of the issuance of the search warrant was sufficient to permit District Judge Blackmer to reasonably determine the factual basis for the information furnished and to believe the veracity of the informants named therein.

## B. *Plain View Exception*

{25} Defendant's motion to suppress asserted that the evidence seized at Defendant's residence was in violation of the Fourth Amendment because the evidence was not listed in the search warrant or affidavit, that it was not discovered inadvertently, and thus the police acted unreasonably in seizing such evidence. At the suppression hearing, defense counsel conceded that proof that evidence not listed in a search warrant was discovered inadvertently is no longer a

requirement under the plain view exception. The trial court, however, found that the seizure of the evidence was unreasonable because the search warrant affidavit did not mention drugs, and thus the seizure of the drugs exceeded the scope of the authorized search.

{26} The State argues that the trial court erred in rejecting its argument that, although the evidence in question was not listed in the search warrant, the evidence, nevertheless, is admissible because it was discovered in plain view during a lawful search of Defendant's residence. We agree.

{27} We review the legal issue of whether the drug evidence was properly seized pursuant to the plain view exception under a de novo standard of review. *See State v. Attaway,* 117 N.M. 141, 144, 870 P.2d 103, 106 (1994). " 'The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.' " *State v. Williams,* 117 N.M. 551, 555, 874 P.2d 12, 16 (1994) (quoting *Payton v. New York,* 445 U.S. 573, 587, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). The plain view exception "permits seizure of evidence discovered in the course of an intrusion for which there was prior justification, such as a search warrant." *Id.*

{28} In this case the officers seized the evidence while conducting a lawful search of Defendant's residence pursuant to a valid search warrant for counterfeiting equipment or counterfeit materials. *See Williams,* 117 N.M. at 556, 874 P.2d at 17. As discussed above, the search warrant was valid because it was based on probable cause from which the issuing judge could independently determine the veracity of the information provided by the named informants. The evidence sought to be suppressed was found on top of a dresser, on a night table, and inside a closet.

{29} In addition, Officer Maez testified that the incriminating character of the drugs seized was "immediately apparent." *See id.* Maez testified that he immediately believed the drugs and drug paraphernalia were contraband. Finally, as Defendant conceded below, the inadvertence requirement for the discovery of evidence under the plain view exception has been discarded. *See id.* (inadvertence prong of plain view exception "is no longer a requirement for the seizure of objects in plain view"). To the extent *State v. Arredondo,* 1997–NMCA–081, ¶ 20, 123 N.M. 628, 944 P.2d 276, indicates that the inadvertent discovery requirement is a necessary factor in upholding the validity of evidence found in plain view, it is overruled.

{30} In sum, we conclude that the evidence discovered and seized during the search of Defendant's residence pursuant to the search warrant was admissible under the plain view exception.

## C. Other Alleged Defects

{31} Defendant alternatively argues that even if the controlled substances seized by the law enforcement officers are determined to have come within the proper ambit of the plain view exception, there are other grounds which support the trial court's order suppressing the evidence. In this regard, he asserts that the police failed to knock and announce as required by Article II, Section 10 of the New Mexico State Constitution and *Attaway,* 117 N.M. at 149–50, 870 P.2d at 111–12 (reasonableness of search and seizure generally necessitates that officers entering a residence to knock and announce their presence and purpose). In *State v. Vargas,* 121 N.M. 316, 321, 910 P.2d 950, 955 (Ct.App.1995), this Court explained, however, that proof of exigent circumstances may justify dispensing with the knock and announce requirements. Here, the trial court listened to the tape recording made by the officers at the time of the forced entry and expressly stated that "I don't have a problem with the way [the search warrant] was executed." The tape recording, together with the testimony of Officer Rodriquez that law enforcement officers had received previous information that the occupants of the residence had access to firearms, amply supports the trial court's rejection of Defendant's argument concerning the knock-and-announce rule.

{32} Defendant also argues that the motion to suppress should be affirmed because

the information in the warrant was stale. *See State v. Lovato*, 118 N.M. 155, 157, 879 P.2d 787, 789 (Ct.App.1994). Defendant points out that Hudgins' statement recites that he visited Defendant's residence three weeks before the search warrant was issued. Defendant also points out that the affiant's characterization of when Turner was last at Defendant's residence was ambiguous. Further Defendant asserts that the staleness of the information was demonstrated by the fact that the items listed in the search warrant were not present when the police searched Defendant's residence.

{33} Determination of whether the information in an affidavit for issuance of a search warrant is stale is made by reviewing the content of the affidavit for search warrant and applying a common-sense reading. *See id.* at 158, 879 P.2d at 790. The time factor is important if its passage makes it unlikely that the object sought will be in the place where it was previously observed. *See id.* Defendant's argument on this point relies primarily on the efficacy of Hudgins' written statement. In determining the sufficiency of an affidavit for search warrant, we consider only the information contained within the four corners of the affidavit. *See State v. Pargas*, 1997–NMCA–110, ¶ 7, 124 N.M. 249, 948 P.2d 267. Even if the last time that Hudgins saw the counterfeiting equipment in Defendant's residence was three weeks prior to the search, the information given to the police by Hudgins and Turner described a continuous, ongoing criminal activity. *See State v. Garcia*, 90 N.M. 577, 579, 566 P.2d 426, 428 (Ct.App.1977). Thus, the passage of time was of less significance. According to the affidavit, the counterfeiting equipment was located in Defendant's residence and Hudgins saw it being used on more than one occasion.

{34} In addition, "[u]nlike drugs, which can be consumed or distributed," counterfeit equipment is generally not consumed, and it is reasonable to infer that it would be continually utilized. *Pargas*, 1997–NMCA–110, ¶ 22, 124 N.M. 249, 948 P.2d 267. Based upon the information contained in the affidavit, we conclude that the trial court could reasonably reject Defendant's staleness claim

and find that the affidavit indicated the existence of probable cause for the issuance of the search warrant.

{35} Defendant also argues that the motion to suppress should be affirmed because the affidavit for search warrant was misleading. Defendant identifies three statements in the affidavit which he contends were misrepresentations made by Special Agent Downey. He asserts: (1) that Downey did not state that Hudgins' observations occurred three weeks prior; (2) that Downey did not state that Hudgins said he tore up the counterfeit money after being told to do so by Turner's boyfriend; and (3) that Turner's written statement said that Hancock, not Defendant, as recited in the affidavit, handed the fake money to Hudgins. Defendant argues that these alleged misrepresentations render the search warrant invalid.

{36} A court does not look beyond the four corners of an affidavit except where the party challenging the veracity of the warrant calls into question the truthfulness of statements made therein, or unless the challenge is substantiated by an offer or proof showing that the affidavit "contained material deliberate falsehoods or a reckless disregard for the truth." *State v. Donaldson*, 100 N.M. 111, 117, 666 P.2d 1258, 1264 (Ct.App.1983). Defendant has the burden of proving that the alleged misrepresentations are material and were deliberately made or were published with a reckless disregard for the truth. *See id.* Defendant did not present any facts to the trial court which demonstrated that Special Agent Downey knew the statements in the affidavit were false or were recklessly made. Additionally, Defendant did not establish how the alleged misrepresentations were material to the issuing judge's determination of probable cause for the issuance of the search warrant. Thus, we conclude this aspect of Defendant's argument is without merit.

{37} Finally, Defendant, relying in part on *Stanford v. Texas*, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965), argues that the order of suppression should be upheld because the search warrant was overly broad in its scope and violated both the federal and state constitutional provisions requiring war-

rants to describe with particularity the items to be seized. *See* U.S. Const. amend. IV; N.M. Const. art. II, § 10.

{38} In *Stanford* the Supreme Court determined that the warrant which identified items to be seized as " 'books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments concerning the Communist Party of Texas' " was overly broad. 379 U.S. at 486, 85 S.Ct. 506. The Court applied a heightened standard for review of a search warrant in which items to be seized are written materials sought based on the written ideas they contain. *See id.*

{39} Our review of the record fails to find factual support for the application of the result in *Stanford* to the instant case. The affidavit for search warrant recites that Hancock was engaged in an ongoing counterfeiting operation at Defendant's residence. Based on this information, District Judge Blackmer issued a search warrant authorizing and directing the executing law enforcement officers

> to view the materials on the computer software, hardware and computer screens, and to read them, make "hard copies" of all materials in the computer discs, software and hardware; also, executing officers are authorized to view videotapes ... and make copies of them, and to listen to such videotapes, seized pursuant to this search warrant. Also, they are authorized to read, photograph and photocopy all documents, books, pamphlets and instructions and writings seized ....

The items described in the search warrant to be searched and seized were described with sufficient particularity to be specifically related to the counterfeiting activity believed to be occurring at Defendant's residence. Producing counterfeit currency and documents is often a highly complex process which may require piecing together large numbers of seemingly innocuous items or materials " '[l]ike a jigsaw puzzle.' " *State v. Jones,* 107 N.M. 503, 505, 760 P.2d 796, 798 (Ct.App. 1988) (citation omitted). Thus, we hold that the search warrant was not impermissibly broad.

*CONCLUSION*

{40} For the reasons discussed herein, the order suppressing the evidence seized in execution of the search warrant is reversed and the cause is remanded for further proceedings consistent herewith.

{41} IT IS SO ORDERED.

APODACA and WECHSLER, JJ., concur.