2000-NMCA-016

995 P.2d 1033

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Jerome KNIGHT, Defendant–Appellant.**

No. 19,801.

Court of Appeals of New Mexico.

Jan. 10, 2000.

Certiorari Denied, No. 26,174, March 3, 2000.

Patricia A. Madrid, Attorney General, Max Shepherd, Assistant Attorney General, Albuquerque, for Appellee.

Phyllis H. Subin, Chief Public Defender, Will O'Connell, Assistant Appellate Defender, Santa Fe, for Appellant.

## OPINION

WECHSLER, Judge.

{1}   Defendant appeals from his conviction of conspiracy to traffic crack cocaine, a controlled substance.   The trial evidence included   taped   telephone   conversations   obtained through a court-authorized wiretap. Defendant contends that the district court should have suppressed the tapes because the affidavit supporting the wiretap was constitutionally inadequate and unsworn and that the evidence was insufficient to support his conviction.   We affirm.

### Facts

{2}   On February 13, 1996, District Court Judge Stephen K. Quinn issued an order authorizing law enforcement agents to intercept, monitor, and record the telephonic communications   conducted   from   the   home   of Ronnie McDonald (McDonald) and Charity Hood (Charity) in Clovis, New Mexico.

{3}   The conversations leading to Defendant's arrest took place on February 24, 1996.   On that evening, the police monitored several calls between McDonald's and Defendant's homes.   The first occurred at 10:08

p.m. when Charity Hood, McDonald's wife, called Tammy Knight (Tammy), Defendant's wife. Charity said that she "made it back from the store." Tammy debated about going to McDonald's house, and the conversation continued. Tammy asked Charity if she "bought the bag" and if it was "alright if I come get a couple" or "sit and do a couple with you." When Charity agreed, Tammy stated that she needed a ride and told Charity she would call her back. Tammy called Charity at 10:47 p.m. and inquired about whether she could get Jerome or Cedric to "run me down there and pick them up." The discussion included the following:

> Charity: You think he gonna break his or something?
>
> Tammy: Yea.
>
> Charity: Cause I sent it back to him?
>
> Tammy: Uh huh.
>
> Charity: You think Cedric will break them?
>
> Tammy: Huh?
>
> Charity: You think he'll give you his?
>
> Tammy: Yea.
>
> Charity: You won't think he'll mess with them?
>
> Tammy: Huh uh.
>
> Charity: Ok, tell him them.
>
> Tammy: So, that's cool?
>
> Charity: Uh huh. Yea, you got some beer?

Tammy called two more times to tell Charity that she was getting a taxi. After Tammy arrived at McDonald's house, Defendant called to speak to her. He spoke instead with Charity.

> Charity: Hello. I hear you.
>
> Defendant: Let me speak to Tammy.
>
> Charity: Yea. Wait just minute. She just, uh, she went back outside to give him the money.
>
> Defendant: Is she on her way?
>
> Charity: Yea. Wait just one minute. She outside. Wait.
>
> . . . .
>
> Defendant: Hey?
>
> Charity: Yea?
>
> Defendant: Cedric want two.

> . . . .
>
> Charity: Oh. That's it. I'm, I'm, I'm gonna give Tammy some to give to you. Ok?
>
> Defendant: Alright. Where's uh . . .
>
> Charity: Huh?
>
> Defendant: (inaudible)
>
> Charity: I can't hear you.
>
> Defendant: He want two.
>
> Charity: Oh, uh, I don't have any then.
>
> Defendant: Alright.
>
> Charity: Ok, then. Bye bye.

{4} The next conversation recorded was also Defendant calling Charity. Tammy had left McDonald's house by taxicab for home. The police stopped the taxi and searched Tammy. They found four rocks of crack cocaine and a crack pipe. Defendant arrived and spoke with the police in the street and returned home to call Charity. He told her that Tammy had been "pulled" and if she "got anything" to "get rid of it" or "flush it." Thereafter, Charity called Tammy to discuss the incident, each woman saying that they were mere users, rather than dealers of the drug.

{5} An officer at trial testified that the amount of crack cocaine that Tammy had was inconsistent with personal use.

*Wiretap Order*

{6} The wiretap order was based on the affidavit of Jim Skinner, Senior Special Agent for the Ninth Judicial District Attorney's Office. Agent Skinner stated in the affidavit, *inter alia,* that: (1) he had extensive training and experience in criminal investigation related to the solicitation of murder and controlled substances; (2) he had good and sufficient reason to believe that McDonald "has been, is now, and will continue to be engaged in the trafficking of various controlled substances, including, but not limited to 'Crack' cocaine, or in an organized criminal conspiracy with other persons for the purpose of trafficking narcotics and controlled substances"; (3) he had good and sufficient reason to believe that McDonald "has been, is now, and will continue to be engaged in planning the murder of Mike

Reeves, a narcotics agent with the Region V/Metro Narcotics Task Force"; (4) he had reason to believe that "telephone conversations between Ronnie McDonald and others concerning the planned murder of Mike Reeves have been, are now, and will continue to be made"; and (5) visual surveillance has proven ineffective and unsuccessful and perspective surveillance, either visual or "on-the-scene electronic surveillance" would place undercover agents at great risk.

{7} Agent Skinner based his affidavit in part upon information received from two confidential informants. The first confidential informant had contacted Agent Mike Reeves to inform him that a relative of McDonald said that McDonald "had paid subjects in Amarillo, Texas, $5,000.00 to murder Reeves." The affidavit stated that the informant "told Reeves that the family member ... said that McDonald knew where Reeves lived and knew which vehicle Reeves drove." Reeves told Agent Skinner that McDonald was an investigative target of the Region V/Metro Narcotics Task Force, suspected of trafficking "at least one kilogram of 'Crack' cocaine per month in the Clovis, NM, area." Reeves also told Skinner that he believed that McDonald had "the resources and connections to have him ... murdered." The affidavit stated that the first confidential informant "had provided information over the past months leading to the arrest and subsequent prosecution of no less than six defendants for felony level narcotics violations as well as probable cause for the execution of at least one search warrant."

{8} According to Skinner's affidavit, six days after Agent Reeves had spoken to Skinner about the first informant, Agent Reeves and Agent J. Longly spoke with a second confidential informant who also informed them that McDonald was planning to murder Reeves. The affidavit did not include any information about whether the second informant had provided previous information to law enforcement officers.

{9} The second confidential informant told Agents Reeves and Longly that he had spent the night drinking at McDonald's house with McDonald and McDonald's brother who lived in Portales, New Mexico. During this time, McDonald stated that he intended to murder the "Head of the Task Force," Mike Reeves, and that McDonald and his brother showed him loaded firearms, including an UZI. This informant told Reeves that McDonald stated that "he knew Reeves drove a red Blazer and that he ... would catch Reeves 'slippin' on Reeves' way to lunch and then kill Reeves."

{10} In cooperation with law enforcement officers, this informant continued to have discussions with McDonald. At an officer's instruction, the informant told McDonald that the informant knew someone in prison who might be interested in killing Reeves. Thereafter, according to the informant, McDonald called the informant for more information about the potential hit man. Then, the informant stated to Agents Reeves and Longly that he was again drinking with McDonald, Tony Gallegos, and Robert Chase in McDonald's car, and McDonald wanted to go to Lubbock, Texas, to meet the potential hit man and pay him $3000 to murder Reeves. Alternatively, McDonald reportedly offered the informant $4000 to do the job. The affidavit states that McDonald told the informant that with Reeves dead, "nothing could stop him," and that he intended to make the money to pay for the murder by February. The informant also stated that Tony Gallegos subsequently called the informant at home to ask if he had yet contacted the hit man for McDonald. Agent Skinner reported in the affidavit that this informant agreed to introduce a police officer to McDonald as the potential hit man, but that McDonald called the informant and told him that he had found someone to commit the murder.

{11} Agent Skinner noted in his affidavit that he had personal knowledge that Agent Reeves was the supervisor or "Head" of the Region V/Metro Narcotics Task Force and occasionally drove a red Chevrolet Blazer and that he learned that McDonald has a brother who lived in Portales. Skinner further noted that McDonald had a felony record and that Agent Reeves had told him that Gallegos was a crack cocaine addict and dealer for McDonald and that Chase "reportedly deals crack cocaine for McDonald."

{12} Although Judge Quinn's order permitted the wiretap to intercept communications concerning solicitation to commit murder, on February 21, 1996, he amended the order to additionally permit the monitoring of conversations concerning drug trafficking. Defendant sought to suppress the evidence obtained as a result of Judge Quinn's order authorizing the wiretap of McDonald's house. Defendant argued that Agent Skinner's affidavit was insufficient to support the issuance of the order. The district court hearing this case, Judge David W. Bonem presiding, entered findings of fact and conclusions of law denying Defendant's motion to suppress.

*Framework for Appellate Review*

{13} The procedure for the issuance of an order permitting a wiretap is controlled by the New Mexico Abuse of Privacy Act. *See* NMSA 1978, §§ 30–12–2 to 30–12–6 (1973, as amended through 1979). Under the statute, an order approving a wiretap must be supported by probable cause. *See* § 30–12–4. The New Mexico Abuse of Privacy Act is modeled after Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510–2522 (1994). *See State v. Coyazo*, 1997–NMCA–029, ¶ 10, 123 N.M. 200, 936 P.2d 882. Because of the similarities between the New Mexico and federal statutes, we find federal case law construing the probable cause requirement instructive. *See id.* Federal courts have construed the probable cause required for an order approving a wiretap as the same probable cause required for the issuance of a search warrant. *See United States v. Talbert*, 706 F.2d 464, 467 (4th Cir.1983) (applying search warrant affidavit analysis to order approving wiretap). We therefore review the grant of the wiretap order in the same manner as we review the issuance of a search warrant under New Mexico law. *See id.; see also State v. Cordova*, 109 N.M. 211, 213–18, 784 P.2d 30, 32–37 (1989).

{14} When an issuing court analyzes an affidavit offered in support of a search warrant to search a residence, the court makes an independent evaluation of probable cause that would justify the intrusion. *See Cordova*, 109 N.M. at 213, 784 P.2d at 32; *State v. Snedeker*, 99 N.M. 286, 289–90, 657 P.2d 613, 616–17 (1982). On appeal, we review the sufficiency of the affidavit de novo. *See In re Shon Daniel K.*, 1998–NMCA–069, ¶ 8, 125 N.M. 219, 959 P.2d 553. In reviewing the affidavit, we analyze it in a common-sense manner, rather than in a technical manner. *See id.*

{15} Affidavits supporting search warrants must be sufficiently detailed so that the analyzing court can make a probable cause determination. *See Cordova*, 109 N.M. at 213, 784 P.2d at 32. When there is hearsay information from an informant contained in the affidavit, our Supreme Court has followed the test originally adopted by the United States Supreme Court in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) to determine whether the information, although hearsay, is sufficiently reliable or credible to support a finding of probable cause. *See Cordova*, 109 N.M. at 213, 784 P.2d at 32. Our Supreme Court embraced the *Aguilar–Spinelli* test after carefully considering the "totality of circumstances" test which the United States Supreme Court subsequently adopted in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). *See Cordova*, 109 N.M. at 216–17, 784 P.2d at 35–36.

{16} Under the *Aguilar–Spinelli* test, an unnamed informant may provide information which a police officer affiant includes in a supporting affidavit if the affiant sets out in the affidavit the basis of the informant's knowledge and the underlying circumstances which permitted the affiant to conclude that the informant was credible or provided reliable information. *See id.* The Rules of Criminal Procedure adopted by our Supreme Court permit probable cause to be based upon hearsay in whole or in part, provided there is substantial evidence that forms "a substantial basis for believing the source of the hearsay to be credible and for believing that there is a factual basis for the information furnished." Rule 5–211(E) NMRA 1999. The credibility and factual basis requirements of Rule 5–211(E) have been held by our Supreme Court to meet

New Mexico's constitutional requirements. *See Cordova,* 109 N.M. at 214, 784 P.2d at 33. Rule 5–211(E) provides the "flexible, common sense framework" and structure for the probable cause inquiry our Supreme Court requires. *Cordova,* 109 N.M. at 216, 784 P.2d at 35.

{17} We therefore analyze Agent Skinner's affidavit under the *Aguilar–Spinelli* test, demanding that the hearsay information satisfy both the "basis of knowledge" and "veracity" prongs of the test. *See Cordova,* 109 N.M. at 213, 784 P.2d at 32. We do not alter this analysis because there are two confidential informants who supplied information to the police. As our Supreme Court instructs, the two prongs of the *Aguilar–Spinelli* test "structure the issuing [court's] inquiry in a manner made necessary by the affidavit's reliance on second or third hand reports from an unnamed informant." *Cordova,* 109 N.M. at 214, 784 P.2d at 33.

*Validity of Wiretap Order*

{18} The affidavit in this case is deficient under the *Aguilar–Spinelli* test with respect to the first unnamed informant. Although the affidavit established the informant's reliability by stating that the informant had provided information in the past that led to a determination of probable cause for a search warrant and to arrests and prosecution of narcotics felons, the informant's basis of knowledge was lacking. The informant related hearsay information without providing any information about the manner in which the source of the information had acquired it. Under *Aguilar–Spinelli,* this type of information is unreliable by itself to support the probable cause determination due to the absence of a description of any underlying circumstances. *See Cordova,* 109 N.M. at 213, 784 P.2d at 32.

{19} As to the second informant's information, the affidavit meets the basis of knowledge requirement because it relates in detail the informant's meetings and conversations with McDonald, while clearly describing the underlying circumstances upon which the informant's information was based. However, Defendant argues that the affidavit fails to set forth the second informant's veracity.

Defendant emphasizes the fact that the affidavit does not state that the second informant had provided reliable information to authorities in the past. We reject Defendant's argument.

{20} By definition, when an analyzing court reviews an affidavit for probable cause, the court works in the realm of probabilities rather than in the realm of certainty. *See State v. Bowers,* 87 N.M. 74, 76, 529 P.2d 300, 302 (Ct.App.1974) (stating that a showing of a probability of criminal conduct is sufficient to grant a search warrant). The fact that an informant has provided information that has led to past convictions does not mean that the informant is not fabricating information at a later date. We accept past performance as indicia of veracity because of the probability that the uncertain present result will be the same as in the past. *See State v. Steinzig,* 1999–NMCA–107, ¶ 18, 127 N.M. 752, 987 P.2d 409 (" 'Reliability of an informant may be established . . . by showing that . . . the informant has given reliable information to police officers in the past. . . .' " (quoting *In re Shon Daniel K.,* 1998–NMCA–069, ¶ 12, 125 N.M. 219, 959 P.2d 553)); *State v. Thompson* 13 Wash.App. 526, 536 P.2d 683, 685 (1975) (the past reliability of the informant on similar occasions certainly supports the inference that the informant is providing accurate information at a later date). Nevertheless, other forms of reliability beyond past truthful information can also serve to provide the court with sufficient probability of an informant's veracity. For example, we have recognized that information provided by a citizen-informant, statements against penal interest, information independently corroborated by police investigation, the naming of the informant, independent corroboration, and the facts and circumstances of the case all may import sufficient veracity or reliability in a particular instance. *See Steinzig,* 1999–NMCA–107, ¶¶ 18–23, 127 N.M. 752, 987 P.2d 409; *In re Shon Daniel K.,* 1998–NMCA–069, ¶ 12, 125 N.M. 219, 959 P.2d 553; *State v. Barker,* 114 N.M. 589, 591–93, 844 P.2d 839, 841–43 (Ct. App.1992) (holding that certain statements against penal interest reflect upon an informant's veracity).

{21} In this case, we have particular circumstances and a degree of corroboration which the district court considered sufficient to satisfy the veracity concerns of the *Aguilar–Spinelli* test. First, the circumstances weighed in favor of the second informant's veracity. He spoke on several occasions with the investigating officer, providing significant details of his meetings and conversations with McDonald and others. He cooperated with the officers in an effort to unveil McDonald's crime of solicitation to commit murder, a crime for which there may not be significant observable activity or physical evidence that investigators can readily identify and observe. The issuing court could view this history of repeated sessions and extensive cooperation with the investigating officers as well as the detail of the reported contacts with the suspect as circumstantial guarantees of credibility, enhancing the informant's veracity. To be sure, the informant could nevertheless have been misleading the officers for his own purposes because the officers had told him that they would help him obtain probation if he cooperated with them, even though he faced penalties as an habitual offender. This agreement, however, when viewed together with the informant's efforts at cooperation, adds rather than detracts from his reliability, thereby reducing the risk of fabrication. *See United States v. Wagner*, 989 F.2d 69, 73 (2d Cir. 1993) ("[C]ommon sense tells us that ... where the [confidential informant] cooperated with the government ... it is far more likely than not that ... deception [is] absent."); *see also* Wayne R. LaFave, *Search and Seizure* § 3.3(c), at 129–30 ("[O]ne who knows the police are already in a position to charge him with a serious crime will not lightly undertake to divert the police down blind alleys.... In such a situation, it is the 'clearly apprehended threat of dire police retaliation should he not produce accurately' more ... than the admission of criminal conduct which produces the requisite indicia of reliability."), *quoted with approval in Steinzig*, 127 N.M. 752, 987 P.2d 409, 1999–NMCA–107, ¶ 20.

{22} In addition to cooperating with the government, the second informant's information was largely corroborated by the first informant's statements that McDonald intended to murder Reeves. *Cf. Steinzig*, 1999–NMCA–107, ¶ 21, 127 N.M. 752, 987 P.2d 409 ("An additional factor recognized by some courts which may corroborate the credibility of an informant is the fact that certain facts supplied by him or her have been independently corroborated."). We do not believe, as Defendant argues, that because the first informant's information did not satisfy the *Aguilar–Spinelli* test, the issuing court was precluded from considering the statement which supported the second informant's reliability. *See State v. Turkal*, 93 N.M. 248, 250, 599 P.2d 1045, 1047 (1979) (corroboration between different informants' statements provided basis for reliability). In its determination of probable cause, the issuing court observed that the agents received similar information from separate sources, which tended to make the information (and its sources) more reliable. Notably, the particulars of the information received in this case were very similar with respect to the knowledge of Reeves' vehicle and the hiring of a hit man. Therefore, despite the fact that the first informant did not have a sufficient basis of knowledge for the issuing court to consider the informant's statement as a basis for probable cause, the first informant's information nevertheless bears upon the second informant's veracity.

{23} Under the circumstances of this case in which the affiant stated that the second informant cooperated with police, had multiple direct contacts with the subject, and reported detailed information on the firsthand statements of the subject that was very similar to the other information the police received, the issuing court could properly consider the second informant's statements under the *Aguilar–Spinelli* test. Thus, the district court did not err in denying Defendant's motion to suppress.

*Unsworn Affidavit*

{24} Defendant further argues that the district court should have suppressed all wiretap evidence because Agent Skinner did not properly execute an oath or affirmation. Section 30–12–3 (1973) provides that an application to intercept a wire or oral communi-

cation "be made in writing upon oath or affirmation to a judge of a district court."

{25} The State does not dispute that Agent Skinner did not execute an affidavit upon oath or affirmation to a judge of the district court. Agent Skinner signed the applications for both the original intercept order as well as the amended order in the presence and with the assistance of a notary public. The affidavits in both instances contained the following language: "Subscribed and sworn to or declared and affirmed to before me in the above named county of the State of New Mexico." The notary public who signed the original application and who worked for the district attorney's office testified at a hearing on the motion to suppress that she never had sworn a witness before notarizing a witness' signature. Hence, Defendant argues that the affidavit procedure violated not only Section 30–12–3, but also NMSA 1978, § 14–13–1 (1953), which states:

> Whenever any person shall be required to take an oath before he enters upon the discharge of any office, place or business, or on any lawful occasion, any person administering the oath shall do so in the following form, viz: the person swearing shall, with his right hand uplifted, follow the words required in the oath as administered, beginning: I do solemnly swear, and closing: so help me God.

*See also* NMSA 1978, § 14–13–2 (1953) (an affirmation is a valid substitute for the oath and is also made under penalty of perjury).

{26} The district court denied Defendant's motion to suppress on the following grounds: (1) the "formal ritual of the administration of the oath by the notary public is desirable but, under the circumstances of the pending matter, is not mandatory;" and (2) Section 30–12–3 "does not require that the oath or affirmation be administered by a judge of a district court but simply that the execution of the application be 'upon oath or affirmation.'" We agree with the district court.

{27} We first look to whether a notary public must administer the formalities of oath embodied in Section 14–13–1 or an affirmation under Section 14–13–2 in order

for a sworn statement to be deemed as given under oath or affirmation in accordance with the wiretap statute. *See* § 30–12–3. Generally, a statement is properly sworn if the person giving the statement would be subject to prosecution for perjury if the statement were fabricated. *See Citizens for Incorporation, Inc. v. Board of County Comm'rs*, 115 N.M. 710, 715, 858 P.2d 86, 91 (Ct.App.1993) ("A sworn statement is one made under penalty of perjury."); *see also State ex rel. Transp. Dep't v. Yazzie*, 112 N.M. 615, 617, 817 P.2d 1257, 1259 (Ct.App.1991) (sworn statements under Motor Vehicle Code are made under penalty of perjury); *cf. White v. State*, 102 Nev. 153, 717 P.2d 45, 48 (1986) (per curiam) (perjury conviction can stand only when oath is required by law).

{28} Section 30–12–3 required Agent Skinner to apply for a wiretap order in a written statement made under oath or affirmation. *See* § 30–12–3. Because Agent Skinner's statements were being used in a judicial proceeding, a false statement would subject him to prosecution for perjury. *See* NMSA 1978, § 30–25–1 (1963). An affidavit is a sworn statement that is signed under oath or affirmation. *See Kiehne v. Atwood*, 93 N.M. 657, 667, 604 P.2d 123, 133 (1979) (an affidavit is a "written statement, under oath, sworn to or affirmed by the person making it before some person who has authority to administer an oath or affirmation.") (citation omitted). We believe that an affidavit can be sufficiently sworn, even though the notary failed to administer the formalities of the oath. *See Blackburn v. Motor Vehicles Div.*, 33 Or.App. 397, 576 P.2d 1267, 1269 (1978) ("merely signing a form of affidavit in the presence of a notary or an official authorized to administer an oath is sufficient" to meet the oath requirement).

{29} Agent Skinner signed his name over lines stating "affiant," which alerted him to the nature of the document he was signing and his actions with regard to the document. In each application, he provided detailed information such that he understood his duties and the purpose of signing the

document.[1] He took the document to the notary public and signed the document. The notary public signed and sealed it. Although the formalities of Section 14–13–1 stress the significance of an oath, the important nature of the affidavits in this instance and Agent Skinner's exercise of the formalities in completing the affidavits sufficiently fulfilled the requirements of an oath or affirmation. *See Blackburn*, 576 P.2d at 1270 ("[An] affiant, by appearing in front of a notary and signing a document in the form of an oath, aware that it is to be accepted and processed as a sworn document, has sufficiently 'bound his conscience' to constitute the procedure as an oath.").

{30} Defendant also argues that the language of Section 30–12–3 required Agent Skinner to make the writing upon oath or affirmation in court and in front of the district judge. While we agree that Section 30–12–3 could be read as Defendant suggests, we are guided in our interpretation of that section by Rule 5–211(E). Our Supreme Court promulgated this rule to establish the procedure for obtaining a search warrant. *See id.*

{31} Rule 5–211(E), discussing probable cause, states: "Before ruling on a request for a warrant the court may require the affiant to appear personally and may examine under oath the affiant." Under Rule 5–211(E), a judge has discretion to decide whether to require the affiant's presence in court before the judge makes a probable cause determination. Defendant's reading of Section 30–12–3 is inconsistent with the rule and would require us to assume our Supreme Court adopted a rule that contradicted existing legislation. We are unwilling to do so. *See State v. Alvarez*, 113 N.M. 82, 85, 823 P.2d 324, 327 (Ct.App.1991) ("To interpret the rule [as conflicting with the statute] would be to assume the supreme court adopted a rule inconsistent with controlling statutory law. We will not do so."). The statute and the rule in this case can and should be concurrently applied.

{32} When Rule 5–211(E) is read together with Section 30–12–3, it is clear that the statute only requires that an application be "in writing upon oath or affirmation" and directed to a district court judge. The affiant need not make the oath or affirmation in front of a judge. The application procedure in this case was consistent with the requirements of New Mexico law.

*Sufficiency of the Evidence*

{33} Defendant also raises a sufficiency of the evidence claim. He argues that even though the evidence may have established that he attempted to procure crack cocaine through the agency of his wife and Charity, such evidence does not establish that he engaged in the conspiracy. Defendant additionally argues that the State presented the jury with alternative theories of guilt based on either Defendant intending to possess the crack cocaine for his own use or Defendant conspiring with Charity to deliver the drug to Cedric. As Defendant notes, we analyze the sufficiency of the evidence " 'in the light most favorable to the State, resolving all conflicts and indulging all permissible inferences in favor of the verdict.' " *State v. Contreras*, 120 N.M. 486, 489, 903 P.2d 228, 231 (1995) (quoting *State v. McAfee*, 78 N.M. 108, 110, 428 P.2d 647, 649 (1967)).

{34} When we review the evidence under this standard of review, we cannot agree with Defendant's position. To establish that Defendant committed the crime of conspiracy to traffic a controlled substance, the State needed to prove, beyond a reasonable doubt that: (1) Defendant and another person by words or acts agreed together to commit the trafficking of a controlled substance; and (2) Defendant and the other person intended to commit trafficking of a controlled substance. *See* NMSA 1978, § 30–31–20(A)(1)–(3) (1990); UJI 14–2810 NMRA 1999; UJI 14–3111 NMRA 1999. On the night in question, after Tammy and Charity had telephone conversations discuss-

---

1. Agent Skinner's Affidavit for Amended Order Authorizing Wiretapping was an exhibit before the district court at the hearing on motions of Defendant and co-defendant Tony Gallegos. The district court granted Defendant's motion to sev- er his trial. This affidavit was not made a part of the record proper in this appeal, but is part of the record proper in *State v. Gallegos*, No. 19,-984. We take judicial notice of the affidavit in this appeal.

ing whether Cedric will "break his or something" or give them to Tammy, Defendant spoke with Charity and told her that "Cedric want two" and Charity responded: "Oh. That's it. I'm I'm I'm gonna give Tammy some to give to you. Ok?" The jury could have reasonably concluded from this conversation, within the context of all of the conversations, that Defendant intended to do more than merely possess crack cocaine for his own use and was conspiring with Charity and Tammy to provide it to Cedric.

{35} We do not agree with Defendant that *State v. Olguin,* 120 N.M. 740, 906 P.2d 731 (1995) applies in this case. In *Olguin,* our Supreme Court held that "a conviction under a general verdict must be reversed if one of the alternative bases of conviction is legally [as opposed to factually] inadequate." *Id.* at 741, 906 P.2d at 732.

{36} There is no legal inadequacy in the case on appeal. The court instructed the jury that to convict Defendant of the conspiracy charge, it must be satisfied beyond a reasonable doubt that Defendant and another agreed together to traffic crack cocaine and that Defendant and the other person intended to traffic crack cocaine. It defined for the jury the elements of trafficking crack cocaine. The jury instructions did not include anything about possession of cocaine. Although the State may have argued possession to the jury, the jury instructions did not permit the jury to accept such an inaccurate theory to convict.

*Conclusion*

{37} We hold that the district court did not err by denying Defendant's motion to suppress and that sufficient evidence existed to support the conviction. We therefore affirm.

{38} **IT IS SO ORDERED.**

PICKARD, C.J., and SUTIN, J., concur.