KENNEDY, Judge, (specially concurring). {23} It is impossible to ascertain whether, after a month and a half, the agents tired of their investigative methods and just decided to return to an “established drug house” to arrest someone. In my view, the facts here establish legitimate reasonable suspicion by barely a nose. Only upon a re-reading of this Opinion did a single fact convince me to concur. Self-reference and subjective hunch-confirming seems to abound without much hard evidence. The district court acknowledged that the agents saw no drugs at any point in their investigations on the day of Defendant’s arrest leading up to the stop of the SUV and acknowledged that “none of the indicators shown here, on their own, taken individually, would provide reasonable suspicion.” • {24} Knowing the deferential standard of review, however, I must reluctantly concur. I write to emphasize the objective standard we must apply and recall the law that “[qjuestions of reasonable suspicion are reviewed de novo by looking at the totality of the circumstances to determine whether the detention was justified.” Robbs, 2006-NMCA-061, ¶ 9. Hindsight, whether investigative or judicial, creates a terrific bias for confirmation of bad evidence. The agents seem not to have once corroborated these “suspects’ ” stories with hard evidence, yet paint a barely sufficient picture for this appeal to sustain their actions. I question the quality of the evidence, even while I vote to affirm its sufficiency in this case. {25} Our courts have routinely rejected adopting rules equating innocent conduct with reasonable suspicion, absent articulable suspicion of criminal activity. Neal, 2007-NMSC-043, ¶¶ 28-29; see also Leyva, 2011-NMSC-009, ¶ 24 (“ ‘Whether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you. Such subjective, promiscuous appeals to an ineffable intuition should not be credited.’ ” (quoting United States v. Broomfield, 417 F.3d 654, 655 (7th Cir. 2005))). Law enforcement officers are permitted to “draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. However, this does not mean that unsupported intuition and inarticulate hunches are sufficient to constitute reasonable suspicion justifying a detention.” Neal, 2007-NMSC-043, ¶ 21 (alteration, omission, internal quotation marks, and citations omitted). The purpose for this objectivity “is to prevent officers from arbitrarily acting on whims or unsupported hunches[.j” State v. Alderete, 2011-NMCA-055, ¶ 11, 149 N.M. 799, 255 P.3d 377. {26} There is no legal standard for where the “suspects” with whom the agents associated during this three-buy investigation fall on the contiuum of sources of information between anonymous tipsters, confidential informants, and identified sources. They certainly have no obligation to be honest; they were all actively committing criminal acts with the agents asking them to do so. None of them ever allowed the agents near one of the “buys,” saying in each instance that the individuals at those locations did not like strangers. This is a great opportunity for misdirection and the suspects’ control of the circumstances. Mendenhall was arrested for other crimes in the course of the investigation. Hall and Malchete were also not confidential informants, because they, too, were “suspects,” who on July 23, necessitated the agents staying together for “safety” when Hall went to make the buy at the “white trailer.” Neither the term “suspect,” nor the concern for officer safety bespeak any level of trust for these collaborators. {27} In this case there are the three relevant events preceding the August 23 stop of the SUV: the Mendenhall buy at Space 104 on July 3, the July 23 “buy” that may or may not have occurred where Hall said it did, and seeing the SUV on Merriweather on August 10. In the first, Mendenhall went in, came out, and turned over drugs. Because the agents were acting as co-criminals with Mendenhall, who was not controlled by them or working off charges, they could not ascertain if he had drugs on his person before he went in, or still had their money when he came out.[6] Nothing appears in the record as to who occupied the trailer at Space 104, whether they had criminal records, or were innocent diversions for Mendenhall. E.g., State v. Barker, 1992-NMCA-117, ¶ 2, 114 N.M. 589, 844 P.2d 839 (describing an informant’s detailed contacts within a drug house). Regarding the SUV, as mentioned later, no facts establish its association with anyone dealing drugs at the Merriweather address on August 10. At the Merriweather buy, the “suspect” already had heroin with him, just “not enough” to satisfy the agents’ request—without a controlled buy, it would be beyond the agents’ capability to demonstrate how much heroin later turned over to the agents even came from the house. All of these buys rest only on the say-so of the “suspects” themselves, and the tunnel vision of the agents. Our deference may be little more than a gloss; the agents were quite unclear in their testimony about whether they recognized the SUV before or after the August 23 stop. However, the majority is correct that minute deconstruction is not the standard we must apply, and Defendant’s doing so is unpersuasive in a “totality of the circmustances” deferential review. {28} In Alderete, an established and reliable confidential informant gave well-corroborated information constituting “specific, predictive information” that was confirmed by police observation that drugs were being delivered to a house. A search warrant for the house had been obtained, and the officers knew it. Alderete, 2011-NMCA-055, ¶ 18. One vehicle had left the house; another capable of carrying such boxes as had been delivered left ten minutes thereafter. The combination of facts and corroboration of a reliable informant’s information supported reasonable suspicion to pull over the car. Id. ¶ 20. A confidential informant is someone who is known to the police, has assisted them with investigations, and whose information led to the seizure of controlled substances and many controlled substances related arrests. Cf. State v. Whitley, 1999-NMCA-155, ¶ 2, 128 N.M. 403, 993 P.2d 117. In this case, there are no reliable informants, no corroboration, and only one observed prior contact with Space 104 that was similar to the July 3 stop the agents made. {29} The “suspects” did not testify here in support of the State to support the conclusions the agents made with actual facts from the buys. All the places from which the “suspects” bought drugs did not like new people, such as the agents, showing up. This trope kept the agents from the possibility of gathering corroborating evidence. The agents, because they were dealing with active criminal suspects and not an informant under their control, did not control the “buys” their compatriots made in their service that might have reduced what I regard as the uncertainty and risk of falsehood about the information provided by an informant. State v. Steinzig, 1999-NMCA-017, ¶¶ 23-24, 127 N.M. 752, 987 P.2d 409. I regard the “suspects” as less reliable than anonymous tipsters, whose information we have previously regarded as “generally less reliable than tips from known informants and can form the basis for reasonable suspicion only if accompanied by specific indicia of reliability, for example the correct forecast of a subject’s not easily predicted movements.” State v. Urioste, 2002-NMSC-023, ¶ 12, 132 N.M. 592, 52 P.3d 964 (internal quotation marks and citation omitted). {30} The sole operative question is whether the stop of the SUV was justified at its inception. I am troubled with the agents’ testimony that they had determined even before the SUV showed up that they would detain anyone involved in “suspicious activity” at Space 104 and had a patrol car already waiting for that purpose. {31} This case resembles Alderete in that the car in that case was stopped based on reasonable suspicion from the investigation, and not a traffic stop. The SUV showed up for a brief time, disgorged some passengers who had some contact with Space 104, returned to the car, and left. Since it is unclear whether the SUV was recognized at the time of the stop, the facts indicate that this stop occurred solely because of the agents’ surveillance of Space 104 and their admitted predilection to stop any car that they thought was acting suspiciously. However, it fit the classic short-time turnaround of a typical drug transaction, and the totality of the circumstances as found by the district court gets the deferential nod. {32} Neal is just a whisker on the other side of the line from this case. In Neal, an officer lacked reasonable suspicion to detain an individual in order to search for drugs where the officer observed the defendant, who had prior drug-related convictions, stop briefly in front of a house and speak to a known felon who resided at the house and was under investigation for drug trafficking. 2007-NMSC-043, ¶ 28. The officer had no specific information that criminal activity had occurred. Id. Our Supreme Court held that the defendant’s suspicious behavior, presence at a known drug house, and prior involvement in drug-related activity were not sufficient to constitute reasonable suspicion to detain the defendant beyond the valid traffic stop. Id. ¶ 23. The Court reasoned that “[the defendant's mere association with a convicted felon . . . who was under surveillance in an ongoing drug investigation}] was insufficient to create reasonable suspicion.” Id. ¶ 30. The Court explained that the totality of the facts presented did not “constitute the type of individualized, specific, articulable circumstances necessary to create reasonable suspicion that [the defendant . . . was involved in criminal activity,” id. ¶ 31, and instead characterized the circumstances as “the type of conjecture and hunch we have rejected in the past as insufficient to constitute reasonable suspicion.” Id. {33} In State v. Ochoa, an officer surveilling a house for drug trafficking observed an unknown vehicle at the house, at the officer’s request, another officer stopped the vehicle in order to identify and question the driver. 2009-NMCA-002, ¶ 2, 146 N.M. 32, 206 P.3d 143. We held that the officer, based on these facts, “lacked a constitutionally reasonable suspicion that [the defendant was involved in drug activity” to justify the stop. Id. ¶ 45. We concluded that the stop was pretextual because the officer lacked reasonable suspicion to support the underlying basis for the stop—investigation of drug activity. Id. ¶ 46. Here, I recall the agents’ intention to stop any suspicious vehicle that stopped at Space 104. Only they were defining “suspicious” at that point. {34} I regard the reasoning we used in State v. Prince, 2004-NMCA-127, 136 N.M. 521, 101 P.3d 332, worthy of repeating, as we held there that the combination of being under investigation for drug involvement and a tip tying the defendant’s movements to drug activity were insufficient to constitute reasonable suspicion to detain the vehicle beyond a valid traffic stop. Guilt by association and generalized suspicions are insufficient grounds upon which to base an investigatory detention. In the absence of specific and particularized incriminating information about the criminal activity that the defendant is or is about to [be] engage[d] in, generalized suspicions and mere corroboration of innocent activity, even if it is not readily available to the general public, is insufficient to create reasonable suspicion for an investigatory detention. Id. ¶ 17 (emphasis added). However, because I believe the totality of the circumstances in this case barely supports our conclusion, I can join the majority in applying the standard of review in this case. I therefore concur. RODERICK T. KENNEDY, Judge This would be what’s known as a “controlled buy”: “[T]he informant entered the residence with some money and no drugs and came out of the residence a few minutes later with drugs and no money. The informant stated that he had purchased the packet of suspected heroin from [the defendant.... The informant then tamed over the packet of suspected heroin to the police. The informant saw or perceived the facts asserted.” Lujan, 1998-NMCA-032, ¶ 12.