**Certiorari Denied, No. 31,524, February 17, 2009**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMCA-031**

**Filing Date: January 8, 2009**

**Docket No. 25,220**

**STATE OF NEW MEXICO,**

  **Plaintiff-Appellee,**

**v.**

**TOM DIETRICH,**

  **Defendant-Appellant.**


**APPEAL FROM THE DISTRICT COURT OF VALENCIA COUNTY**
**Kenneth G. Brown, District Judge**


Gary K. King, Attorney General
Chris Conlee, Assistant Attorney General
Santa Fe, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Susan Roth, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**KENNEDY, Judge.**

**{1}**     Defendant Tom Dietrich was convicted of criminal sexual contact of a minor (CSCM) and two counts of contributing to the delinquency of a minor (CDM) following a jury trial. The victims that testified in the jury trial were R.P. and C.L. Another victim, J.O.,

did not show up for trial, and ten criminal counts relating to him were dropped. Defendant was also convicted of two counts of sexual exploitation of children following a bench trial. On appeal, Defendant contests convictions arising from both trials, raising nine points of error. We affirm, addressing each of Defendant's points of error in turn.

## FACTS AND PROCEDURAL HISTORY

**{2}** This case began in May 2002, when Defendant reported that his house had been burglarized. Detective James Harris began an investigation into the reported burglary and interviewed Defendant's neighbors. Defendant had listed one of the alleged victims in this case, J.O., as a suspect in the burglary. Detective Harris went to the scene of the burglary and spoke with neighbors who reportedly had been seen with J.O. The detective related that Defendant listed two other people as potential suspects in the burglary and claimed that all three people had access to Defendant's residence. Detective Harris discovered that all three suspects had "free rein in and out of the residence" and were living with Defendant on and off.

**{3}** Detective Harris first made contact with J.O. on May 30, 2002. At first, J.O. concealed his identity. He later made an allegation that Defendant tried to rape him. The investigation of the burglary thereafter developed into an investigation about sexual misconduct on the part of Defendant. Detective Harris subsequently obtained search warrants for Defendant's residence that resulted in evidence inculpatory to Defendant's being seized. Defendant was indicted on July 25, 2002, and his jury trial commenced on November 3, 2003. We discuss pertinent facts as they relate to each issue below.

## DISCUSSION

### 1. Affidavit

**{4}** Defendant argues that the affidavit for the search warrants was insufficient because it was based on unreliable information, violating his right against unreasonable searches and seizures under the Fourth Amendment and the New Mexico Constitution. Defendant's brief refers to "the affidavit" for the first of three search warrants that Detective Harris obtained. At trial, Defendant objected to evidence obtained under all warrants. We note that the factual information in the affidavit for the first search warrant formed a common basis for all warrants, and we address the sufficiency of the one affidavit as it affects the three warrants executed on Defendant's premises. Before trial, Defendant sought to have evidence against him suppressed based on deficiencies in the warrants. The district court denied Defendant's motion to suppress.

**Standard of Review**

**{5}** The district court applies "a de novo standard of review to a magistrate's determination that an affidavit for a search warrant alleges facts sufficient to constitute

probable cause." *State v. Nyce*, 2006-NMSC-026, ¶ 8, 139 N.M. 647, 137 P.3d 587. This Court conducts the same review as the district court. *State v. Gonzales*, 2003-NMCA-008, ¶ 13, 133 N.M. 158, 61 P.3d 867. We limit our review to the contents of the affidavit and apply a common-sense reading, considering the document as a whole "to determine whether the issuing judge made an . . . independent determination of probable cause based on sufficient facts." *Nyce*, 2006-NMSC-026, ¶ 8 (alteration in original) (internal quotation marks and citation omitted); *see State v. Steinzig*, 1999-NMCA-107, ¶ 14, 127 N.M. 752, 987 P.2d 409. The affidavit presented to the magistrate must demonstrate "probable cause to believe that a crime is occurring or that seizable evidence exists at a particular location." *Nyce*, 2006-NMSC-026, ¶ 9. The magistrate's decision, however, must have been objectively reasonable, which is of special import when considering the search of a home. *Id.* ¶¶ 11-12.

**{6}** Probable cause "may be [based on] hearsay in whole or in part, provided there is a substantial basis for believing the source of the hearsay to be credible and for believing that there is a factual basis for the information furnished." *State v. Cordova*, 109 N.M. 211, 214, 784 P.2d 30, 33 (1989) (emphasis omitted) (internal quotation marks and citation omitted); Rule 5-211(E) NMRA. Double hearsay can support probable cause. *See State v. Perea*, 85 N.M. 505, 509, 513 P.2d 1287, 1291 (Ct. App. 1973). Defendant contests the reliability of the information that made up the affidavit and its substance. We therefore review the information and its legal sufficiency de novo. *Steinzig*, 1999-NMCA-107, ¶ 15 ("[W]hether the contents of an affidavit are legally sufficient is a question of law which we review de novo.").

**The Investigation**

**{7}** The following facts were contained in the affidavit submitted to the magistrate in this case. Detective Harris was a full-time, salaried, and certified law enforcement officer investigating a burglary that Defendant reported at his house. After Detective Harris began the investigation of the burglary, he received the name of one suspect, J.O., and made contact with him. J.O. responded to Detective Harris's questioning about his relationship with Defendant by stating: "That mother fucker [sic] tried to rape me." J.O. stated that he had spent time living with Defendant from the time he was thirteen until as recently as May of 2002. He also alleged that Defendant repeatedly made sexual advances toward him, had sodomized him before he reached the age of eighteen, and had taken "nude or sexually explicit pictures of him . . . without his consent," pictures that could be found on Defendant's computer. J.O. told Detective Harris to contact J.B., an inmate at the juvenile detention center in Albuquerque, ostensibly to corroborate J.O.'s statements.

**{8}** When Detective Harris questioned J.B. at the juvenile detention center, J.B. declined to make any statements. Detective Harris spoke to an employee of this detention center, unnamed in the affidavit, who told the detective that there had been other similar allegations made against Defendant. This employee also told Detective Harris about an incident in which Defendant had delivered a cupcake to J.B. with a note stating "I am your daddy."

3

**{9}**   Detective Harris spoke with J.O.'s girlfriend Darlene Gonzales, who told the detective that after she had an altercation with J.O., Defendant told her that he was going to drug J.O. "to the point of incapacitation and then have sex with him."

**{10}**   Detective Harris further spoke with a person referred to in the affidavit as the supervisor in charge of adult probation and parole in Valencia County. Harris was told that although Defendant had worked there, he had been discharged for "misconduct" involving clients. The detective also spoke with unnamed persons at the sheriff's office in Valencia County. One sheriff's deputy who had responded to reports of parties at Defendant's home found "numerous young juvenile males" present. Another unnamed sheriff's deputy reported to the detective that he had dealt with Defendant, that Defendant had "three or four young [male] juveniles" with him on that occasion, and that he believed that there was alcohol present. The deputy also believed those juveniles to have been clients within the juvenile probation system. Additionally, when Detective Harris contacted the game and fish department of Sierra County, he discovered that Defendant had been arrested for contributing to the delinquency of a minor during an incident near Elephant Butte Lake.

**{11}**   J.O. also made allegations that Defendant was reporting burglaries in order to defraud his insurance company and that Defendant had previously reported that his home was burglarized. Detective Harris checked three reports filed by Defendant and noted several inconsistencies among them, including the possible listing of duplicate items. Detective Harris requested a search warrant based on all of these facts, and the magistrate judge authorized it.

**Hearsay, Named and Unnamed Informers**

**{12}**   "[I]t is necessary that the affidavit provide a factual basis for the informant's personal knowledge," such as dealings with or observations of the defendant. *State v. Baca*, 97 N.M. 379, 381, 640 P.2d 485, 487 (1982). When facts provided by an informer are independently corroborated, we accord greater weight to the informer's credibility. *See Steinzig*, 1999-NMCA-107, ¶ 21. Identifying an "informant" by name is a significant factor in determining the veracity or reliability of the information. *See id.* ¶ 19. "[A] named informant has greater incentive to provide truthful information because he or she is subject to unfavorable consequences for providing false or inaccurate information to a greater degree than an unnamed or anonymous individual." *Id.*

**{13}**   Defendant argues that the affidavit in this case was constitutionally inadequate because it did not "satisfy the basis of knowledge or the credibility prong of the *Aguilar Spinelli* test." *See generally Aguilar v. Texas*, 378 U.S. 108 (1964); *Spinelli v. United States*, 393 U.S. 410 (1969). This Court noted in *Steinzig* that the strictures of *Aguilar-Spinelli* "were aimed primarily at *unnamed* police informers." *Steinzig*, 1999-NMCA-107, ¶ 19 (internal quotation marks and citation omitted). "If the affidavit rests on hearsay—an informant's report—what is necessary under *Aguilar* is one of two things: the informant must declare either (1) that he has himself seen or perceived the fact or facts asserted; or (2)

4

that his information is hearsay, but there is good reason for believing it[.]" *Spinelli*, 393 U.S. at 425 (White, J., concurring).

**{14}** J.O. was a citizen-informer named in an affidavit. All persons to whom Detective Harris spoke were identified in the affidavit by name or position. The information obtained by Detective Harris in further investigations and interviews with several other informants[1] following the allegations made by J.O. does not require the same scrutiny required by *Aguilar-Spinelli* because that information merely corroborated J.O.'s story of Defendant's predilections and did not form the basis for the allegations leading to probable cause to issue a warrant. The affidavit in this case rests on first-hand accounts of Defendant's crimes by citizen-informer J.O. Corroboration obtained by Detective Harris in further investigation bolsters the reliability of J.O.'s allegations.

### J.O.'s Motivations

**{15}** Defendant makes much of the fact that Detective Harris's investigation began based on a report of a burglary committed in Defendant's home and quickly transformed into an investigation of Defendant himself based on allegations made by J.O. Defendant's argument insinuates that J.O. made allegations against Defendant in order to turn the detective's attention from himself and onto Defendant. This implies that J.O. had a motive to lie and thus maintains that his information cannot be reliable. While any or all of J.O.'s statements might have been true, the issue is the extent to which Harris acquired and used sufficiently reliable information to continue his investigation of all matters on which he acted. The fundamental inquiry in cases such as this one is whether the underlying circumstances show that the informant's information is reliable.

**{16}** Courts have looked at an informant's motivation for telling the truth to investigating officers when the informant is aware that if his information is false, he could be held accountable for filing a false report. *See People v. Rodriguez*, 420 N.E.2d 946, 950 (N.Y. 1981) (noting that it would behoove a criminal defendant to tell the truth about criminal activities of another because "[h]e must . . . have known that sending the police on a fruitless errand would avail him of little[.]"); *State v. Thomas*, 673 N.W.2d 897, 908-09 (Neb. 2004) ("[B]y identifying himself or herself by name, the informant is put in the position to be held accountable for providing a false report, which makes the informant more reliable."). The New York Court of Appeals noted in *Rodriguez* that the defendant's situation of being in custody was "not necessarily an indicator of his unreliability." 420 N.E.2d at 950. Instead, the Court noted, the defendant could have made his statement revealing the criminal activities of another because he knew that the police would act on it. *Id.* Similarly, we do not solely consider the circumstances under which a person who himself is the subject of a criminal investigation makes a statement, but we also weigh the fact that the informant

---

[1] "Everyone who gives information to the police might be called an 'informant' in the broad sense of that word." 2 Wayne R. LaFave, *Search and Seizure* § 3.3(a) (4th ed. 2004).

provided his or her name and that subsequent investigation corroborated the informant's statements.

> A different rationale exists for establishing the reliability of named "citizen-informers" as opposed to the traditional idea of unnamed police contacts or informers who usually themselves are criminals. Information supplied to officers by the traditional police informer is not given in the spirit of a concerned citizen, but often is given in exchange for some concession, payment, or simply out of revenge against the subject. The nature of these persons and the information which they supply convey a certain impression of unreliability, and it is proper to demand that some evidence of their credibility and reliability be shown. One practical way of making such a showing is to point to accurate information which they have supplied in the past.

*State v. Paszek*, 184 N.W.2d 836, 842 (Wis. 1971).

**{17}** Further, even if it appears that the informant is seeking revenge, it does not necessarily indicate a motive to falsify allegations. *See People v. Isenberg*, 367 N.E.2d 364, 366 (Ill. App. Ct. 1977) (rejecting the defendant's contention that the informant could not be reliable because he was seeking revenge on the defendant based on the informant's brother's hospitalization and holding that the informant could be considered an ordinary citizen); *State v. Olson*, 2003 MT 61, ¶ 27, 66 P.3d 297 (noting that even if a citizen-informant has mixed motives, his information can still be reliable). While the fact that J.O. made allegations against Defendant while being investigated for a burglary perpetrated on Defendant's property casts doubt on J.O.'s truthfulness, we cannot ignore that he remained a named informant and that Detective Harris further investigated and received corroborating information.

**{18}** Indeed, in *State v. Knight*, 2000-NMCA-016, ¶ 21, 128 N.M. 591, 995 P.2d 1033, this Court considered the cooperation of a criminal defendant in providing information to law enforcement officers when that information was later used in an affidavit. We stated that the agreement, "when viewed together with the informant's efforts at cooperation, adds [to] rather than detracts from his reliability, thereby reducing the risk of fabrication." *Id.*

**{19}** J.O. was the citizen-informer in this case, providing information to Detective Harris that was soon confirmed by Darlene Gonzales. Detective Harris also obtained information from J.O. suggesting that Defendant had other inappropriate contact with juvenile males. That information was also later confirmed by a staff member at the juvenile detention center in Albuquerque and by persons at the sheriff's office in Valencia County and the game and fish department in Sierra County. From J.O.'s statements that Defendant took unauthorized nude photographs of him and attempted to rape him, the magistrate could reasonably infer that Defendant's house could contain evidence of those illegal activities. *See Gonzales*, 2003-NMCA-008, ¶¶ 12, 14 ("[W]e give deference to the magistrate's reasonable factual

6

inferences underlying the probable cause determination."). The magistrate could also reasonably infer that there was evidence of drugs at Defendant's house based on the statement of Darlene Gonzales that Defendant intended to use drugs to facilitate a sexual encounter with J.O.

**{20}** In this case, we have numerous cooperating informants; and most do not share J.O.'s motivations regarding Defendant. Rather, the majority were employees of state agencies and were forthcoming with information about Defendant despite having nothing to gain. The information provided by the informants corroborated accounts by J.O. and Darlene Gonzales that Defendant was engaged in inappropriate conduct with juvenile males. *See State v. Turkal*, 93 N.M. 248, 250, 599 P.2d 1045, 1047 (1979) (noting that an affidavit contained probable cause when personal information provided by the informant was corroborated by other sources).

**{21}** Detective Harris went to the juvenile detention center in Albuquerque to speak with J.B., and although J.B. declined to provide a statement, an employee there related the incident involving the cupcake. We recognize that the employee at this detention center was unnamed in the affidavit, but we do not find that particularly troubling. The person is identified as an employee of a particular detention center who had a face-to-face conversation with Detective Harris and gave detailed, specific information. This was no anonymous or confidential informant but rather a government employee talking about information within his official knowledge. *See Knight*, 2000-NMCA-016, ¶ 20 (recognizing that information provided by a citizen-informant, independently corroborated by police investigation and the naming of the informant, along with independent corroboration considered with the facts and circumstances of the case "all may import sufficient veracity or reliability in a particular instance").

**{22}** Detective Harris also received confirmation that Defendant had been employed by Valencia County in adult probation and parole and had been terminated due to "misconduct" with clients. In addition, Detective Harris heard several allegations about Defendant's association with young juvenile males, and that several of those instances included alcohol. The magistrate was entitled to consider reasonable inferences from Defendant's activities and the allegations made against him, despite the potentially suspicious circumstances under which J.O. furnished his information. *Nyce*, 2006-NMSC-026, ¶ 9. We conclude that there was enough independent corroborating information, apart from J.O.'s allegations, for the magistrate to determine that probable cause existed to search Defendant's house for the items the detective had been told he would find there. *Id.* ¶ 14 ("[O]rdinary, innocent facts alleged in an affidavit may be sufficient if, when viewed together with all the facts and circumstances, they make it reasonably probable that a crime is occurring in the place to be searched.").

**{23}** We hold that the affidavit was supported by probable cause and therefore that the district court did not err in denying the motion to suppress.

## 2. Filing Returns of Warrants With the Court After Execution

**{24}** Defendant argues that because the search warrants were not returned, filed in court, or signed by a judge or clerk, the warrants are invalid and the evidence obtained as a result of the warrants should be suppressed. Defendant relies on *State v. Montoya*, 86 N.M. 119, 120, 520 P.2d 275, 276 (Ct. App. 1974), for his argument that the failure to return a search warrant renders the warrant void.

**{25}** First, *Montoya* is of little precedential value in this case as this Court adopted its partial dissent in *State v. Malloy*, 2001-NMCA-067, ¶ 15, 131 N.M. 222, 34 P.3d 611. *Montoya* held that the search warrant "had no direction on its face that it be returned to the issuing judge and no such return was ever made," rendering the warrant invalid. 86 N.M. at 120, 520 P.2d at 276. However, in *Malloy*, this Court noted that the purpose of the warrant requirement was "to provide the property owner assurance and notice during the search" and that two levels of error apply to executing a search warrant: fundamental error and merely technical error. 2001-NMCA-067, ¶ 11.

**{26}** Second, Defendant did not raise this argument in the district court; he raises it here for the first time. Because he did not preserve the issue in the district court, we review it only for fundamental error. *State v. Cunningham*, 2000-NMSC-009, ¶ 8, 128 N.M. 711, 998 P.2d 176. Fundamental error may be found upon one or more of the following bases: "there has been a miscarriage of justice," the question of the defendant's guilt "is so doubtful that it would shock the conscience" to allow his conviction to stand, or "substantial justice has not been done." *State v. Orosco*, 113 N.M. 780, 784, 833 P.2d 1146, 1150 (1992). We may also hold that a fundamental error has been committed where we determine that there was an "error . . . of such magnitude that it affected the trial outcome." *State v. Jacobs*, 2000-NMSC-026, ¶ 58, 129 N.M. 448, 10 P.3d 127. As our Supreme Court stated in *Cunningham*, 2000-NMSC-009, ¶ 13, fundamental error applies only in those cases where a criminal defendant's innocence is in dispute or where allowing his conviction to stand "would shock the conscience." *Id.* (internal quotation marks and citation omitted).

**{27}** Defendant in this case received notice of the search warrants and signed the inventories. He was aware of what was seized and had a copy of the warrants. He does not assert a substantive problem with the execution of the warrants or the evidence seized thereunder. *Perea*, 85 N.M. at 509, 513 P.2d at 1291 (holding that, without a showing of prejudice, "an otherwise valid search warrant" will not be set aside "because of defects in the return of the warrant"); *Malloy*, 2001-NMCA-067, ¶ 11 ("Technical violations require suppression only if the defendant can show prejudice or if there was a deliberate disregard of the rule by the police."); *see State v. Wise*, 90 N.M. 659, 662, 567 P.2d 970, 973 (Ct. App. 1977); *State v. Baca*, 87 N.M. 12, 15, 528 P.2d 656, 659 (Ct. App. 1974); *Perea*, 85 N.M. at 509-10, 513 P.2d at 1291-92 (holding that matters involving defects in the return of a warrant are "ministerial acts which, even if defective or erroneous, do not require a search warrant to be held invalid unless prejudice is shown"). The actions taken in this case comport with the purpose of the rule, which was to provide Defendant with notice and assurance during the search. *Malloy*, 2001-NMCA-067, ¶ 11.

8

**{28}** This is a longstanding view. In *Rose v. United States*, 274 F. 245, 250 (6th Cir. 1921), the Sixth Circuit stated that "[t]he failure of the officer to whom a search warrant is directed to make a return thereof cannot invalidate the search or seizure made by authority of such warrant." The Sixth Circuit articulated that a return could be made at any time after the warrant was executed, and thus, the defect could be cured. Furthermore, such a defect "does not bear consequences of constitutional dimension." *Malloy*, 2001-NMCA-067, ¶ 21. Defendant did not object to this technical defect below nor give the State an opportunity to cure it. Defendant's contention at this late juncture is without merit.

### 3.      Evidence of an Uncharged Act:  Rule 11-404(B) NMRA

**{29}** Defendant argues both fundamental error and abuse of discretion on the part of the district court in allowing hearsay evidence of bad acts into evidence at the jury trial. Defendant argues that the district court erred by allowing as evidence nude photographs of R.P. and C.L. and a bag containing sex toys. Defendant also complains of testimony from O.L. concerning experiences with Defendant, including a feeling by O.L. of having been drugged, and testimony from Detective Harris concerning conversations that he had in the course of his investigations into sexual allegations against Defendant.

**Detective Harris's Testimony**

**{30}** Defendant concedes that he did not object at trial to the evidence of which he now complains. Again, he seeks our review under the doctrine of fundamental error and argues "that the admission of the bad act testimony deprived him of a fair trial." As we stated above, a fundamental error can be adjudged where a miscarriage of justice has occurred, the result shocks the conscience, or substantial justice has been denied. *Orosco*, 113 N.M. at 784, 833 P.2d at 1150. Also sufficient for us to hold that a fundamental error has been committed is the determination of an "error . . . of such magnitude that it affected the trial outcome." *Jacobs*, 2000-NMSC-026, ¶ 58. Absent "error [that] goes to the foundation . . . of the case or take[s] from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive," we will not reverse the district court. *Cunningham*, 2000-NMSC-009, ¶ 13.

**{31}** Detective Harris's testimony of which Defendant now complains was as follows:
      [State] From the investigation that was provided to you, what did you do next?

      [Harris]      [J.O.] also advised that I needed to go and make contact with an individual at the juvenile detention center at Camino Nuevo. He identified the subject as an inmate there by the name of [J.B.].
            I went over to the Camino Nuevo and made contact with [J.B.].

            . . . .

9

> [Harris]          And he – I spoke with the adult probation – or I'm sorry – the superintendent of Camino Nuevo and told him that I needed to speak with this individual, [J.B.], that it was in reference to some allegations that were made against [Defendant]. That individual stated that he had also received some allegations and that at one point there was a note left –

At this point, the prosecutor interrupted the answer and did not inquire further into what the detective heard.

**{32}** On appeal, Defendant argues that this testimony about allegations against Defendant that surfaced at the juvenile detention center at Camino Nuevo while Detective Harris was investigating there was so "prejudicial" that it rose to the level of fundamental error. We disagree. Defendant fails to point out how this testimony resulted in any fundamental error other than to say "[i]t is hard to imagine evidence that is more prejudicial." This statement, without more, is merely conclusory.

**{33}** For instance, Defendant relies upon the holdings of both *State v. Barber*, 2004-NMSC-019, ¶¶ 16-17, 135 N.M. 621, 92 P.3d 633, and *Cunningham*, 2000-NMSC-009, ¶ 13, for the proposition that fundamental error occurs whenever a defendant is denied a fair trial, irrespective of the defendant's apparent guilt or innocence. These citations, as statements of law, are flawless, but such statements of law are as far as Defendant goes. He makes no argument as to how, exactly, the inclusion of this evidence resulted in fundamental unfairness, choosing instead to assert that the evidence was "prejudicial." Without a proper application of the law to the facts, we must reject Defendant's argument.

**O.L.'s Testimony**

**{34}** Defendant also argues that fundamental error occurred when O.L. was allowed to testify about his experiences with Defendant, even though O.L. was not an alleged victim at Defendant's trial. O.L. testified about meeting Defendant at the juvenile detention center, going to "hang out" at Defendant's house, and going with Defendant to Elephant Butte and getting arrested there while they were drinking. The State contends that O.L.'s testimony was relevant to establish Defendant's relationship with C.L., O.L.'s brother, and the relationship among all three people.

**{35}** Defendant's objection to the inclusion of O.L.'s testimony intertwines with his objection to the testimony of Detective Harris. Just as he challenges Detective Harris's testimony, he likewise asserts the "prejudicial" effect of O.L.'s testimony. As we stated, this Court will reverse a conviction for fundamental error only where the defendant demonstrates a miscarriage of justice, a conviction that shocks the conscience, a denial of substantial justice, or an error of such magnitude that it affects the outcome of the trial. *Orosco*, 113 N.M. at 784, 833 P.2d at 1150; *Jacobs*, 2000-NMSC-026, ¶ 58. Defendant makes no such showing, choosing instead to rely on the conclusory statement that the inclusion of this evidence was "prejudicial."

10

**Physical Evidence:  Photographs and Sex Toys**

**{36}**    Before trial, Defendant moved to sever the sexual exploitation charges from the charges of CSCM and CDM.  Included in the motion were references to photographs of the two victims who testified at trial, R.P. and C.L.  In its response, the State argued that the photographs were relevant and necessary to prove the charges against Defendant and showed intent, motive, plan, preparation, and/or absence of mistake.  The district court severed the charges but ruled that the photographs of R.P. and C.L. could be admitted during the jury trial, citing "compelling legal and factual reasons" to allow the evidence.

**{37}**    At trial, Defendant made an objection to the admission into evidence of items seized under the warrants, noting that it was a continuing objection from the issues raised during the pre-trial suppression hearing.  Defendant also initially objected to the admission into evidence of a bag containing sex toys that was taken from Defendant's home but later stipulated to the fact of its existence.  However, Defendant argued that the jury should not be able to see the contents of the bag.  The court admitted this evidence but postponed showing it to the jury.  Defendant does not argue that the jury ever saw the contents of the bag or that the bag's contents were ever described to the jury.

**{38}**    Defendant merges his argument regarding both the photographs and the bag of sex toys.  Defendant argues that those pieces of evidence were prohibited propensity and character evidence and that the district court failed to perform a balancing test to determine whether the probative value of the evidence outweighed its prejudicial effect as required by Rule 11-403 NMRA.  Defendant argues that the State was using the evidence "to show that [Defendant] acted in conformity with the sort of person who would commit CSCM and CDM."  The State counters that the photographs were relevant and admissible because they showed Defendant's relationship with the victims and went towards proving the element of "unlawfulness" in the CSCM charge.

**{39}**    We review the admission of physical evidence of bad acts under an abuse of discretion standard.  *See State v. Allen*, 91 N.M. 759, 761, 581 P.2d 22, 24 (Ct. App. 1978) (noting that admission of such evidence was within the discretion of the trial court); *State v. Romero*, 2006-NMCA-045, ¶ 73, 139 N.M. 386, 133 P.3d 842, *aff'd*, 2007-NMSC-013, 141 N.M. 403, 156 P.3d 694.

**{40}**    "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith."  Rule 11-404(B). We consider two paramount factors in deciding whether the district court abused its discretion in admitting the evidence:  "whether the State made a sufficient showing that the evidence would serve a legitimate purpose other than to show character . . . and whether the probative value was substantially outweighed by the danger of unfair prejudice or other factors."  *State v. Jordan*, 116 N.M. 76, 80, 860 P.2d 206, 210 (Ct. App. 1993).

**{41}**    "A requisite element of the charged crime of CSCM is that the defendant's touch was

11

'unlawful.'" *State v. Kerby*, 2007-NMSC-014, ¶ 26, 141 N.M. 413, 156 P.3d 704. "Unlawfulness may be proven by showing that defendant's behavior was done . . . to arouse or gratify sexual desire." *Id.* (alteration in original) (internal quotation marks and citation omitted). In *State v. Jones*, 120 N.M. 185, 188, 899 P.2d 1139, 1142 (Ct. App. 1995), this Court held that "evidence of other bad acts might be admissible if a specific type of intent were at issue and the other bad acts bore on that intent in a way that did not merely show propensity." We went on to demonstrate an example of when other bad act evidence might be admissible: "if the defendant were accused of assault with intent to commit [criminal sexual penetration] and evidence of other sexual assaults were offered to establish the defendant's intent when grabbing the victim." *Id.* On the other hand, "[a] state of mind that continues over time and governs otherwise unconnected acts is generally called a person's character trait or propensity." *State v. Aguayo*, 114 N.M. 124, 129, 835 P.2d 840, 845 (Ct. App. 1992) (internal quotation marks and citation omitted). "Admission of character traits to prove that the defendant acted in accordance with those traits is, of course, exactly what Rule 404(B) is designed to prohibit." *Id.*

**{42}** On appeal, Defendant argues that "[t]he prejudice of having the jury see (and hear about) nude photographs of [R.P. and C.L.], when the photos were not an element of the CSCM and CDM charges, is unquestionable." However, "[e]vidence of prior acts with the complaining witness can directly bolster the complaining witness's testimony by providing significant corroboration." *State v. Landers*, 115 N.M. 514, 519, 853 P.2d 1270, 1275 (Ct. App. 1992). When used for such a purpose, this evidence is admissible and not considered propensity evidence. *Id.* The State argued that the photographs would corroborate the victims' testimony and demonstrate the overall nature of the victims' relationships with Defendant.

**{43}** At trial, R.P. identified nude photographs of himself that were found on Defendant's computer. R.P.'s testimony was limited to identifying himself in the photographs and characterizing the photographs as nude depictions of himself and his specific body parts. R.P. then testified that it was Defendant who took the photographs. R.P. also testified that when Defendant was taking the photographs, some sexual activity took place between the two of them, and that he was either sixteen or seventeen years old at the time. Defendant made no objection to the testimony. C.L. also testified that Defendant took nude photographs of him, while he was sleeping and without his permission. C.L. identified these photographs of himself. Defendant made no objection to the testimony.

**{44}** Under the facts of this case and upon a careful review of the record, we hold that the district court did not abuse its discretion in allowing into evidence photographs of the victims and the victims' testimony. The photographs corroborated the victims' testimony and provided context for the events that occurred. *State v. Mora*, 1997-NMSC-060, ¶ 54, 124 N.M. 346, 950 P.2d 789 ("Photographs are relevant and admissible for the purpose of clarifying and illustrating testimony." (internal quotation marks and citation omitted)); *State v. Crump*, 82 N.M. 487, 494-95, 484 P.2d 329, 336-37 (1971) (holding that other sexual acts committed by the defendant were not independent of the charged crime, provided an

explanation for the crime, and were incidental to it). The photographs were relevant to the victims' credibility, which Defendant attempted to attack during trial, and were not offered to merely show Defendant's character or propensity to commit the crimes charged. Defendant has made no showing of an abuse of discretion or of prejudice. We hold that the photographs were properly admitted.

**{45}** Defendant stipulated to admitting the bag containing sex toys into evidence. In fact, when Detective Harris began describing the contents of the bag, the prosecutor interrupted and asked him not to "delineate" the specific items. Defendant provides no basis for us to determine that the district court erred, and we need not consider issues not briefed. *State v. Harbison*, 2007-NMSC-016, ¶ 26, 141 N.M. 392, 156 P.3d 30.

### 4. *Crawford* and the Sixth Amendment

**{46}** Defendant argues that his Sixth Amendment rights were violated because he was unable to cross-examine J.O. J.O. did not appear at Defendant's trial. Specifically, Defendant now objects to statements that came in through Detective Harris. Detective Harris testified about what J.O. had alleged, including the rape allegations and that J.O. had lived with Defendant on and off since he was thirteen. Defendant did not object to this hearsay testimony at trial.

**{47}** Defendant argues that the statements amounted to fundamental error at trial because Defendant was never able to cross-examine J.O. Because Defendant never objected to the admission of the statements below, we review the statements and determine whether their admission created fundamental error. *Cunningham*, 2000-NMSC-009, ¶ 8; *see State v. Martinez*, 2007-NMSC-025, ¶ 25, 141 N.M. 713, 160 P.3d 894 (reviewing a defendant's Confrontation Clause claim for fundamental error even though the issue was not preserved). "In a fundamental error analysis, where the defendant has waived all error by failing to object, the Court's goal is to search for injustice." *State v. Benally*, 2001-NMSC-033, ¶ 33, 131 N.M. 258, 34 P.3d 1134. (Baca, J., dissenting).

**{48}** Detective Harris testified at trial that when he contacted him, J.O. made serious allegations against Defendant.

> [Harris]      . . . . I asked [J.O.] if – I told him I needed to talk to [him] in reference to a burglary [and] that I was a detective with the Los Lunas Police Department. And that I was investigating a burglary that had occurred at the house of [Defendant] and I needed to speak to [J.O.] in reference to that. And I really needed to talk to him because I felt that there might have been more to the – to the incident that was reported.
>
> [State] And what did this individual inform you of next?
>
> [Harris]      At that time he opened the door. He asked he [sic] who I – or

13

he asked me what I meant by that statement. I asked him if he was [J.O.], he state [sic] that had [sic] he was. I asked him to tell me what he could tell me about the situation at [Defendant's] home and he made a statement to the effect that [Defendant] tried to rape him.

. . . .

[State] What did he mention to you about [Defendant]?

[Harris]  He stated that – he stated that there was – you know, that he had been with [Defendant] on and off since he was 13 years old, that he had met [Defendant] at the juvenile detention center when [Defendant] was employed at the juvenile detention center. He stated that he – that on at least one occasion he had been drugged, that [Defendant] was constantly trying to get him to do sexual favors for him.

At this point, the district court asked the State and defense counsel to approach the bench. The district court judge remarked that he was "hearing a lot of hearsay" and expressed concern that defense counsel was not objecting. Nevertheless, the testimony continued.

**{49}**  Later in his testimony, Detective Harris revisited his conversation with J.O.
[Harris]  During my initial conversation with [J.O.], he also advised that [Defendant] had taken nude and sexually explicit photographs of him as well as other people and that he had placed them on his computer using a digital camera.

. . . .

[Harris]  . . . . I also spoke – I spoke with other people during my investigation that lead [sic] me to believe that there may have been some form of sexual misconduct going on.

**{50}**  The Confrontation Clause of the Sixth Amendment to the United States Constitution states, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" The United States Supreme Court further clarified the Confrontation Clause in *Crawford v. Washington*, 541 U.S. 36, 68 (2004), providing that in order for a testimonial hearsay statement to be admitted at trial, the witness must be unavailable at trial and the defendant must have had a prior opportunity to cross-examine the witness. While the Court did not provide a definition for "testimonial," it spelled out that the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* The Court noted that "testimony" could be defined as a "solemn declaration or affirmation made for the purpose of establishing or proving some fact" and that an "accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an

14

acquaintance does not." *Id.* at 51 (internal quotation marks and citation omitted). *Crawford* does not apply, however, where the testimonial statement is not offered to prove the truth of the matter asserted. *Id.* at 59 n.9.

**{51}** We note that Defendant failed to preserve this confrontation issue in the district court. We therefore analyze it only for fundamental error. *Compare Romero*, 2006-NMCA-045, ¶¶ 15, 70 (indicating that preserved *Crawford* issues are analyzed under a harmless error standard), *with Martinez*, 2007-NMSC-025, ¶ 25 (indicating that unpreserved *Crawford* issues are reviewed for fundamental error only).

**{52}** We repeat the standard for fundamental error. A fundamental error occurs where there has been a miscarriage of justice, the conviction shocks the conscience, or substantial justice has been denied. *Orosco*, 113 N.M. at 784, 833 P.2d at 1150. We may also conclude that a fundamental error has been committed upon a determination that a trial court's "error was of such magnitude that it affected the trial outcome." *Jacobs*, 2000-NMSC-026, ¶ 58. We hold that Defendant's convictions were just and that the district court's admission of the statements in this case was neither an error nor an influence on the trial outcome.

**{53}** The admission of Detective Harris's statement regarding J.O. does not violate *Crawford*. In order for a statement to be testimonial under *Crawford*, it must be offered for the truth of the matter asserted—or in other words, it must be hearsay. *Wilson v. Sirmons*, 536 F.3d 1064, 1111 (10th Cir. 2008). In *Wilson*, a police officer (Officer Huff) testified and was questioned about his motivation for effecting the traffic stop of the defendant Wilson. *Id.* Officer Huff testified that another officer (Officer Meek) informed him that Wilson was driving an automobile that matched the description of a vehicle previously used in a homicide. *Id.* On the basis of this information, Officer Huff stopped Wilson, who was later arrested and charged with homicide. *Id.* Wilson objected to Officer Huff's testimony on the basis that it violated his rights under *Crawford*. *Id.* But the Tenth Circuit rejected Wilson's argument, holding that Officer Huff's testimony was offered only to demonstrate his motivation for stopping Wilson, not to prove that the car Wilson drove was used in a homicide. *Id.* The facts before us require a similar analysis. Like the Tenth Circuit in *Wilson*, we have little difficulty concluding that Detective Harris's statements were not offered to prove the truth of the matter asserted. Detective Harris appeared at J.O.'s home in order to investigate a burglary reported by Defendant. Upon being questioned, J.O. stated, among other things, that Defendant tried to rape him and took nude photographs of him. Defendant did not object to this testimony. And when asked about the nature of this line of questioning, the State said it was attempting to establish the reason why its investigation proceeded from burglary to sexual misconduct. Although the court surmised that this testimony was "hearsay," it never made a ruling on the issue.

**{54}** Despite this speculation by the district court, we harbor little doubt that the evidence was not hearsay; simply, it was not offered to prove the truth of the matter asserted. The statements of J.O. were not offered to prove that he was the victim of an attempted rape or that Defendant photographed him. Instead, they were offered to demonstrate how the

15

investigation proceeded from one of burglary to one of sexual misconduct. Defendant's dismissed charges only lend further support to our holding that Defendant's convictions were safely obtained. Defendant was charged with and convicted of CSCM and CDM based on the testimony of the two victims of those crimes, R.P. and C.L. Statements attributed to J.O. pertained to other charges that were dismissed after the court determined that J.O. would not testify. Thus, J.O.'s statements were not used to prove the elements of the offenses for which Defendant was convicted.

**{55}** The admission of Detective Harris's statements regarding J.O. does not constitute fundamental error. Such a result should be clear from our analysis above, which concludes that the admission of Detective Harris's statements does not constitute *any* error. Further, given the testimony of R.P. and C.L., Defendant's conviction for crimes of which they were the victims does not shock our conscience. *See Orosco*, 113 N.M. at 784, 833 P.2d at 1150. Indeed, because the convictions comport with well-settled constitutional protections, there is neither miscarriage of justice nor denial of substantial justice. *Id.* Little probability exists that Defendant's case would have turned out differently had the testimony of Detective Harris been excluded. *Jacobs*, 2000-NMSC-026, ¶ 58. We therefore affirm.

### 5. Sufficiency of the Evidence for CSCM and CDM involving R.P.

**{56}** Defendant argues that there was insufficient evidence to convict him of CSCM and CDM involving R.P. Specifically, Defendant contends that R.P.'s testimony "never pinned down the dates that [Defendant] allegedly touched his genital area," thereby making the evidence of CSCM "inherently improbable." Defendant also argues that R.P.'s testimony disavows that Defendant engaged in CDM because R.P. never testified that Defendant encouraged him to do drugs or drink.

**{57}** We take a two-step approach in determining the sufficiency of the evidence. *State v. Apodaca*, 118 N.M. 762, 766, 887 P.2d 756, 760 (1994). We begin by reviewing the evidence in the light most favorable to the jury verdict and then make a "legal determination of whether the evidence viewed in this manner could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted). The evidence may be of either a direct or circumstantial nature. *State v. Ungarten*, 115 N.M. 607, 609, 856 P.2d 569, 571 (Ct. App. 1993). "This Court does not consider the merit of evidence that may have supported a verdict to the contrary." *State v. Montoya*, 2005-NMCA-078, ¶ 3, 137 N.M. 713, 114 P.3d 393 (internal quotation marks and citation omitted).

**{58}** To convict Defendant of the charge of CSCM in which R.P. was the victim, the State had to prove beyond a reasonable doubt that

1.  [Defendant] touched or applied force to the penis of [R.P.];
2.  [Defendant] was a person who by reason of his relationship to [R.P.] was able to exercise undue influence over [R.P.] and used this authority to coerce him to submit to sexual contact;

16

3.     [R.P.] was at least 13 but less than 18 years old;
4.     This happened in New Mexico on or between the 1st day of January 2000 and the 30th day of April 2000.

To convict Defendant of the charge of CDM in which R.P. was the victim, the State had to prove beyond a reasonable doubt that

1.     [Defendant] caused [R.P.] to engage in sexual contact and/or underage drinking/drug use;
2.     This caused [R.P.] to conduct himself in a manner injurious to the morals, health or welfare of [R.P.];
3.     [R.P.] was under the age of 18;
4.     This happened in New Mexico on or between the 1st day of January 2000 and the 30th day of April 2000.

**{59}** R.P. was born on May 8, 1982. During R.P.'s direct examination, the prosecutor elicited testimony about salient events in R.P.'s life in order to determine dates for events that occurred with Defendant. The prosecutor relied on where Defendant was living during certain time periods and when R.P. was released from the Bernalillo County youth detention facility. The testimony reflected that R.P. was released to Defendant on February 10, 2000. R.P. testified that during his stay with Defendant, he consumed alcohol, smoked marijuana, and used mushrooms. He further testified that Defendant purchased the alcohol for him, and he remembered one occasion when Defendant purchased marijuana. R.P. testified that while living with Defendant he awoke on several occasions to find himself unclothed and Defendant touching his penis. This occurred between February of 2000 and March of 2000.

**{60}** R.P. testified that he was again released to Defendant on March 29, 2000. R.P.'s testimony indicated that he began drinking and smoking marijuana again. R.P. testified that Defendant purchased alcohol and marijuana for R.P.'s use and that Defendant made sexual advances towards him, similar to the advances that Defendant had previously made. These events were established as having occurred before April 10, 2000, when R.P. was again placed in a detention facility.

**{61}** It is enough that the State provided the jury with approximate dates in which the events described could have occurred. *See State v. Altgilbers*, 109 N.M. 453, 471, 786 P.2d 680, 698 (Ct. App. 1989) ("No juror need have a precise day in his or her own mind in order to vote for conviction."). The dates that were provided as an approximate time line for the dates of the incidents with Defendant are well within the charged time frame. As to the CDM charge, R.P.'s testimony that Defendant provided and purchased drugs and alcohol for him satisfies the element of "caus[ing R.P.] to engage in . . . underage drinking/drug use" whether or not Defendant "encouraged" such use. R.P. testified that he was a heroin user during the time that he spent with Defendant. Providing R.P. with more drugs and alcohol is sufficient evidence that Defendant's acts "caused [R.P.] to conduct himself in a manner injurious to [his] morals, health or welfare."

17

## 6. Impermissible Vouching

**{62}** Before trial, defense counsel argued that Sarah Kerrigan, a Ph.D. toxicology specialist, should not have been allowed to testify. Defense counsel did not object to Kerrigan's qualifications as an expert witness but maintained a continued objection to her testimony in general. On appeal, Defendant cites only to *State v. Alberico*, 116 N.M. 156, 169, 861 P.2d 192, 205 (1993), to support his argument but uses this authority solely to point out that the admission of expert testimony lies within the district court's discretion. Defendant does not provide any particular objection or any case law for his contentions that Kerrigan's testimony was "pure vouching" and "prejudicial." Thus, we decline to address Defendant's argument. *State v. Rivera*, 115 N.M. 424, 427, 853 P.2d 126, 129 (Ct. App. 1993) (noting that because the defendant did not cite any authority supporting his contention, this Court need not consider it).

## 7. Addition of "New" Charge

**{63}** Defendant argues that he was never charged with the crime of sexual exploitation by possession of child pornography, yet he was still convicted of two counts of that crime. Defendant was indicted on five counts of possession of child pornography with intent to distribute. Before the trial, the State unsuccessfully attempted to amend this grand jury indictment to a charge of mere possession of child pornography, a crime that made such possession a fourth degree felony if the child was under eighteen years of age.

**{64}** At the bench trial, the district court dismissed three of the sexual exploitation charges, noting that there was no evidence of distribution (as was required by the statute in effect when those crimes allegedly occurred). However, the district court found Defendant guilty of two counts of sexual exploitation by possession, noting that the time frames for the corresponding criminal acts fell under the newer 2001 law, which only required possession of pornography for conviction. Defendant argues that the district court's actions were improper and violated his due process rights.

> Rule 5-204(A) NMRA states in part:
> The court may at any time prior to a verdict cause the complaint, indictment or information to be amended in respect to any . . . defect, error, omission or repugnancy if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced.

Thus, we are faced with a two-part test of the propriety of the district court's actions that determines: (1) whether an additional or different offense was charged and (2) if any substantial rights of Defendant were prejudiced. *See id.*

**{65}** The original indictment charged Defendant with five counts of sexual exploitation of children in violation of NMSA 1978, Section 30-6A-3(A) (1993). The indictment alleged in the first count, and similarly in the others, that Defendant

did intentionally distribute or possess with intent to distribute a visual or print medium depicting a prohibited sexual act or simulation of such an act where one of the participants in that act was a child under the age of eighteen years knowing or having reason to know that the medium depicted a prohibited sexual act or simulation of such an act[.]

The current version of Section 30-6A-3(A) states that

[i]t is unlawful for a person to intentionally possess any obscene visual or print medium depicting any prohibited sexual act or simulation of such act if that person knows or has reason to know that the obscene medium depicts any prohibited sexual act or simulation of such act and if that person knows or has reason to know that one or more of the participants in that act is a child under eighteen years of age.

§ 30-6A-3(A) (2001) (amended 2007). Pursuant to the 2001 amendment, Subsection (A) required the State to prove only that Defendant possessed the photographs. Under the previous version reflected in the original indictment, the State was not only required to prove that Defendant possessed the photographs but also that he intentionally distributed or intended to distribute the photographs. Essentially, the State had one less element to prove as a result of the change in the statute.

**{66}** Defendant argues that in effect an entirely new charge was added to his indictment, in violation of Rule 5-204(A). Defendant cites *State v. Roman*, 1998-NMCA-132, ¶ 9, 125 N.M. 688, 964 P.2d 852, to support his argument. Defendant contends that he was prejudiced by the district court's actions, because his intention was to "attack the possession with intent to distribute and distribution element charged in the grand jury indictment."

**{67}** "[I]t is permissible to amend an information to conform to evidence introduced in support of the charge made in the information." *Id.* ¶ 11. Amendment of an information "to include lesser included offenses" is also permissible. *Id.* We consider the district court's actions as an amendment of the information because the otherwise adequate information in the indictment was supplemented by the new version of the statute. *Id.* ¶ 12. The amendment did not add any additional elements to the charge and did not bring in matters that were not directly at issue on any of the charges. *Id.* ¶ 13; *see State v. Armijo*, 90 N.M. 614, 618, 566 P.2d 1152, 1156 (Ct. App. 1977) (excluding matters that "went beyond the issues in the case"). It did not substantially alter the nature of the case before the court. *See In re Garrison P.*, 2002-NMCA-094, ¶ 9, 132 N.M. 626, 52 P.3d 998.

**{68}** "An 'included offense' is one which has some, but not all, of the elements of the greater offense and does not have any elements not included in the greater offense, so that it is impossible to commit the greater offense without necessarily also committing the included offense." *State v. Hamilton*, 107 N.M. 186, 188, 754 P.2d 857, 859 (Ct. App. 1988). It is clear that the new statute included all of the elements of the old statute except

19

the element of intent to distribute. Therefore, we hold that the amendment did not charge an "additional or different offense." *See* Rule 5-204(A).

**{69}** We now turn to whether the amendment of the indictment information prejudiced Defendant's substantial rights. Defendant argues that he was on notice that he would be defending against the old statute, which included the element of intent to distribute, and that his defense was to attack that element. "A variance between the crime charged and the offense for which defendant was convicted will not be deemed to be fatal unless the defendant could not reasonably have anticipated from the indictment or information, the nature of the charges and proof against him." *Hamilton*, 107 N.M. at 189, 754 P.2d at 860. It is clear that Defendant knew that he was indicted for possessing photographs of nude boys on his computer.

**{70}** The amended indictment information from August 21, 2002, included five counts charging "[s]exual [e]xploitation of [c]hildren," abbreviated as "[p]ossession" in the indictment. Each count described the crime of sexual exploitation of a child as intentional distribution or possession with the intent to distribute "visual or print medi[a] depicting a prohibited sexual act or simulation of such an act where one of the participants in that act was a child under the age of eighteen [or sixteen] years." Each charge also referred to the statute as "[Section] 30-6A-3(A)." The State divided the charges into five groups based on the year in which the photographs were allegedly downloaded onto Defendant's computer. Each charge represented that Defendant engaged in the prohibited act over the course of a year, for the calendar years of 1997, 1999, 2000, and 2001, through June 6, 2002.

**{71}** During the May 6, 2004, bench trial on the five counts of sexual exploitation of a child, the district court dismissed the charges relating to 1997, 1999, and 2000. The charges that remained for 2001 and 2002 fell under the 2001 amendment of the sexual exploitation statute that made mere possession a crime. Defendant knew what the State was prepared to offer as evidence against him, and because the amended information filed in 2002 cited the correct statute, we fail to see how Defendant could not have reasonably known what he would be defending against.

**{72}** On March 30, 2004, more than five weeks before the bench trial at which Defendant was convicted of two counts of sexual exploitation of a child, the State filed a motion to amend the grand jury indictment to reflect the changes in the statute that became effective on July 1, 2001, giving Defendant further notice. The amended indictment confirmed the statutes and the previously admitted evidence on which the State would base its case. We therefore hold that Defendant was not charged with an "additional or different" offense and that his "substantial rights" were not prejudiced. *See* Rule 5-204(A).

## 8.    Amended Criminal Information

**{73}** Defendant argues that Counts 16, 19, and 22 in the first grand jury indictment, three CDM counts relating to C.L., were withdrawn by the prosecutor and later "improperly

20

resurrected." Defendant argues that the counts were withdrawn because the grand jury did not find probable cause to support them but that those same counts reappeared in the amended grand jury indictment as Counts 14, 15 and 16. At the hearing on a motion to dismiss those counts, the prosecutor told the district court that he "misspoke as to [the grand jury] not finding probable cause" and that the grand jury properly indicted on all of the CDM counts. The prosecutor asked the district court to look at the transcript from the grand jury as a whole in determining whether to drop the charges. Later in the hearing the prosecutor dropped two of the three counts of CDM relating to C.L., noting that those counts occurred in a different county, but kept one count, noting that there was a dispute as to which county it occurred in. Defendant was convicted of that charge of CDM.

**{74}** Defendant's argument focuses on *Stirone v. United States*, 361 U.S. 212, 216-17 (1960), and on *State v. Trivitt*, 89 N.M. 162, 169, 548 P.2d 442, 449 (1976), for the proposition that a defendant cannot be tried on charges that were not included in the indictment against him. Neither case Defendant relies on addresses the situation before us: whether the grand jury can return an indictment for counts that have been withdrawn by the prosecution. It is clear that the original indictment and the amended indictment included the charge of CDM related to C.L. upon which Defendant was convicted.

**{75}** The State concedes that during the grand jury proceedings, the prosecutor initially withdrew the three CDM charges. The State argues that despite this withdrawal, it "later gave the grand jurors the option to consider any of those charges," which resulted in their finding probable cause for all three counts. Therefore, the State contends, the grand jury returned indictments for those charges. At the hearing, the State argued that its compliance with *State v. Ulibarri*, 1999-NMCA-142, 128 N.M. 546, 994 P.2d 1164, rendered the indictments valid.

**{76}** In *Ulibarri*, this Court held that one of the most basic functions of the grand jury was "to investigate the matter for which it is called and to determine from the evidence if there is probable cause to believe an offense has been committed." *Id.* ¶ 10 (alteration omitted) (internal quotations marks and citation omitted). "While the grand jury should not be the tool of the prosecuting authority to manipulate at will, neither should it be subject to undue interference with its deliberative and decisional process." *Id.* (internal quotation marks and citation omitted). The grand jury is a separate and distinct body from the executive and judicial departments of government. *Id.* ¶ 11. It is empowered to "order that evidence be produced over and above that initially presented by the State." *Id.*

**{77}** Defendant's argument challenges the grand jury process and the manner in which Defendant's indictments arose. *See id.* ¶ 13. Unlike *Ulibarri*, we are not convinced in this case that the prosecutor's action of keeping the CDM charges in the amended indictment (despite having indicated that he would be withdrawing them) went to the heart of the grand jury's function and responsibility. *Cf. id.* ¶ 15. The grand jury was appropriately guided, despite returning an indictment that was contrary to the State's belief in the necessity to withdraw the CDM counts. Defendant received his notice that he was subject to charges of

21

CDM in both the first indictment and the amended indictment, and we disagree with Defendant's claim that he was prejudiced by the grand jury's return on the charges. *See*, *e.g.*, *id.* ¶ 18.

**{78}** We are guided by NMSA 1978, Section 31-6-10 (1979), which states in pertinent part:

> Before the grand jury may vote an indictment charging an offense against the laws of the state, it must be satisfied from the lawful evidence before it that an offense against the laws has been committed and that there is probable cause to accuse by indictment the person named, of the commission of the offense so that he may be brought to trial therefor.

It is clear that the purpose of the grand jury proceedings is to determine whether there is probable cause to indict the person named. The prosecutor's role in the grand jury proceedings is to assist the process. *See* UJI 14-8001 NMRA. "The district attorney will not, however, guide or otherwise influence the grand jury." *Id.*, Committee commentary (*Assistance for grand jury.*). It is ultimately up to the grand jury to decide whether probable cause existed for the various counts. Because the grand jury determined that probable cause existed for the CDM counts relating to C.L., it was within the discretion of the prosecutor to keep those counts alive for the amended criminal indictment. The counts were properly included in the indictment against Defendant, and therefore we affirm his conviction for CDM.

## 9. Ineffective Assistance of Counsel

**{79}** Defendant contends that he received ineffective assistance of counsel, citing multiple incidents from the trial. In determining whether a defendant has received ineffective assistance of counsel, we apply the test of whether "defense counsel exercised the skill of a reasonably competent attorney." *State v. Talley*, 103 N.M. 33, 36, 702 P.2d 353, 356 (Ct. App. 1985). Additionally, the defendant must show that incompetent representation prejudiced his case. *State v. Crain*, 1997-NMCA-101, ¶ 24, 124 N.M. 84, 946 P.2d 1095. Without a showing demonstrating both incompetence and prejudice, defense counsel is presumed competent. *Talley*, 103 N.M. at 36, 702 P.2d at 356; *Jacobs*, 2000-NMSC-026, ¶ 48 ("Counsel is presumed competent unless a defendant succeeds in showing both the incompetence of his attorney and the prejudice resulting from the incompetence."). We consider the record as a whole when determining whether a defendant has received ineffective assistance of counsel. *State v. Lewis*, 104 N.M. 677, 680, 726 P.2d 354, 357 (Ct. App. 1986).

> In considering a claim of ineffective assistance, the duties of counsel are considered. These duties include loyalty, avoiding a conflict of interest, consulting with defendant on important decisions, keeping defendant informed of important developments, and using skill and knowledge to

render the trial a reliable adversarial testing process. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

*Talley*, 103 N.M. at 36, 702 P.2d at 356 (internal quotation marks and citation omitted).

**{80}** Defendant complains about his defense counsel's failure to move for a mistrial when it was discovered that J.O. would not be testifying, failure to object to bad act evidence, stipulation to testimony about the photographs found on Defendant's computer, and failure to call the notary of an affidavit signed by R.P. when R.P. testified contrary to the affidavit. Defendant argues that the instances he recites "call for a presumption of ineffective assistance of counsel." Defendant further argues that his defense counsel's ineffectiveness led to Defendant's convictions.

**{81}** "A prima facie case for ineffective assistance of counsel is not made if there is a plausible, rational strategy or tactic to explain the counsel's conduct." *Jacobs*, 2000-NMSC-026, ¶ 49. "A reviewing court will not attempt to second guess that [conduct]. An attorney's decision to object to testimony or other evidence is a matter of trial tactics." *Id.* (citation omitted).

**{82}** Defendant's first contention, that defense counsel should have moved for a mistrial once it was discovered the J.O. would not be testifying, is without merit. The charges relating to J.O. were dropped upon learning that J.O. would not be testifying. *See*, *e.g.*, *State v. Newman*, 109 N.M. 263, 268, 784 P.2d 1006, 1011 (Ct. App. 1989) (holding that it was not ineffective assistance of counsel where defense counsel requested an admonition instead of a mistrial). Defense counsel did not object to the hearsay testimony relating to J.O. when it came in through Detective Harris, even after an obvious attempt by the district court to bring the testimony to defense counsel's attention as hearsay. This suggests that defense counsel was aware that hearsay testimony had come in but saw no merit in requesting a mistrial because the hearsay testimony related to the nonappearing victim of the dropped charges. At the beginning of Detective Harris's cross-examination, defense counsel brought out J.O.'s allegations again, ostensibly to impeach J.O. through Detective Harris. Furthermore, defense counsel did not "entirely fail[] to subject the prosecution's case to meaningful adversarial testing." *Bell v. Cone*, 535 U.S. 685, 697 (2002) (emphasis omitted) (internal quotation marks and citation omitted). To impeach J.O. through Detective Harris and to discover the tenor of Detective Harris's investigation is exactly what defense counsel attempted to do.

**{83}** As to Defendant's other contentions, we note that defense counsel was an active participant at the trial, attempting to impeach the credibility of the witnesses, filing pre-trial motions addressing numerous counts of the indictment, filing a motion to suppress, and participating in hearings arising from his motions. *See*, *e.g.*, *Newman*, 109 N.M. at 268, 784 P.2d at 1011 (finding the defendant's claim of ineffective assistance of counsel unpersuasive

23

when defense counsel acted "vigorously" on the defendant's behalf). We will not further "review the record to see how many objections were raised by defense counsel or how clever was the cross-examination of the state's witnesses. To be effective, counsel need not be a wizard. Some cases are simply hard to defend." *State v. Brazeal*, 109 N.M. 752, 757, 790 P.2d 1033, 1038 (Ct. App. 1990).

**{84}** "[E]ven if counsel's performance was constitutionally defective, the defendant must still affirmatively prove prejudice." *Id.* Defendant has failed to show that his counsel was ineffective in representing him or that his case was prejudiced by his counsel's representation.

## CONCLUSION

**{85}** We affirm Defendant's convictions.

**{86}** **IT IS SO ORDERED.**

_____

**RODERICK T. KENNEDY, Judge**

**WE CONCUR:**

_____

**JONATHAN B. SUTIN, Chief Judge**

_____

**MICHAEL D. BUSTAMANTE, Judge**

**Topic Index for *State v. Dietrich*, No. 25,220**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-FE | Fundamental Error |
| AE-HE | Harmless Error |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-CP | Criminal Sexual Penetration |
| CL-SX | Sexual Offences |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-AW | Affidavit for Search Warrant |
| CA-CW | Children as Witnesses |

24

| | |
|---|---|
| CA-GJ | Grand Jury |
| CA-IN | Indictment |
| CA-MR | Motion to Suppress |
| CA-PJ | Prejudice |
| CA-PA | Probable Cause |
| CA-RT | Right to Confrontation |
| CA-SZ | Search and Seizure |
| CA-SW | Search Warrant |
| CA-SE | Substantial or Sufficient Evidence |
| | |
| **EV** | **EVIDENCE** |
| EV-CE | Character Evidence |
| EV-CH | Children as Witnesses |
| EV-HR | Hearsay Evidence |
| EV-PG | Photographs |
| EV-PH | Physical Evidence |
| EV-PJ | Prejudicial Evidence |
| EV-PA | Prior Acts or Statements |
| EV-PB | Probative Value vs. Prejudicial Effect |
| EV-SS | Substantial or Sufficient Evidence |